IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| ERIC LAFOLLETTE and CAMILLE LAFOLLETTE, individually and on behalf of others similarly situated, )<br><br>Plaintiffs, )<br><br>v. )<br><br>LIBERTY MUTUAL FIRE INSURANCE COMPANY, )<br><br>Defendant. ) | No. 2:14-CV-04147-NKL |

**ORDER**

Pending before the Court is Defendant Liberty Mutual Fire Insurance Company's motion for summary judgment. [Doc. 99]. As set forth below, Defendant's motion is denied.

**I. Undisputed Facts**

Plaintiffs, Eric and Camille Lafollette, purchased a deluxe homeowners' insurance policy from Defendant, Liberty Mutual Fire Insurance Company ("Liberty Mutual"). Their policy has an endorsement for wind and hail damage. The Lafollette's property was damaged by hail and they sought payment from Liberty Mutual for that hail damage.

**A. Liberty Mutual's General Claims Handling Procedure**

When a homeowner sustains damage to their property that is covered by a Liberty Mutual deluxe homeowner's insurance policy, the claim is handled and paid in two

phases: (1) the actual cash value ("ACV") phase and (2) the replacement cost value ("RCV") phase. [Doc. 106-3].

After the policyowner makes his or her claim, an adjustor goes to the location of the insured property to ascertain the damage. The adjustor then uses a program called "Xactimate" to put a dollar figure on the amount of the damage. The total amount of the loss is referred to as the "replacement cost." After the total amount of the loss is calculated, the adjustor inputs factors for depreciation, and the amount of depreciation is subtracted from the replacement cost to give the actual cash value loss. Following this calculation, the policyowner is paid the ACV of the loss, minus the deductible.[1] No further payment on the claim is made unless the insured decides to repair or replace the damage to the property. The insured is not required to undertake this repair, but may take the ACV payment in satisfaction of their claim. If the insured decides to repair or replace the damage and submits proof of the repairs to Liberty Mutual, the insured is entitled to recover the RCV and a separate check is written to the policyowner to compensate them for the amount of depreciation withheld from the ACV payment.

**B. Lafollettes' Policy**

The Lafollettes' Policy contains three relevant sections: the Declarations, the base policy language, and the endorsements. These sections work together to define the parameters of their coverage. The Declarations set out the limits on recovery under the Policy, list the endorsements included in the Policy, and note the deductibles that may be assessed under the Policy. The base policy language contains the standard terms of the

---

[1] The propriety of the assessment of this deductible is what is disputed in this lawsuit.

policy. The endorsements are additions to the Policy which customize the coverage and terms of the base policy language to create the specific coverage purchased by the policyowner. The terms of the endorsements control over conflicting provisions in the Declarations or base policy language. *Grable v. Atlantic Cas. Ins. Co.*, 280 S.W.3d 104, 108 (Mo. Ct. App. 2009).

The Lafollettes' insurance policy included a Home Protector Plus Endorsement. That endorsement has its own "loss settlement" provision which provides:

> 3. Loss Settlement. Covered property losses are settled as follows:
>
> a. The applicable limit of liability for Buildings under Coverage A or B is the replacement cost, after application of deductible and without deduction for depreciation, subject to the following:
>   (1) We will pay the cost of repair or replacement, but not exceeding:
>   . . .
>   (2) We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss according to the provisions of a.(1) above.
>   . . .
> d. You may disregard the replacement cost provision and make a claim for loss of or damage to property on an actual cash value basis and then make claim within 180 days after loss for additional liability under this endorsement.

[Doc. 100, ¶ 13; Doc. 106, ¶ 5]. The parties agree that this is the loss settlement provision applicable to the loss sustained by the Lafollettes.

The Policy also contains a Windstorm or Hail Deductible Endorsement ("Wind/Hail Endorsement"), which states:

> The following special deductible is added to the policy:

> With respect to the peril of Windstorm Or Hail, we will pay only that part of the total of all loss payable under Section I that exceeds the windstorm or hail deductible.
>
> The dollar or percentage amount of the windstorm or hail deductible is shown on the policy declaration
>
> . . .
>
> No other deductible in the policy applies to loss caused by windstorm or hail.

[Doc. 100, ¶ 15; Doc. 106, ¶ 7]. Because the Lafollettes had a Home Protector Plus Endorsement, the reference to "Section 1" in the Wind/Hail Endorsement, necessarily refers to the Home Protector Plus "loss settlement" provision quoted above.

In addition to these substantive Policy provisions, the first two pages of the Lafollettes' Policy contain "Declarations." The Declarations state there is a $1000 deductible for windstorm or hail damage.

### C. Lafollettes' Claim

In January 2008, the Lafollettes' home sustained hail damage and they submitted a claim for coverage. This claim constituted a loss that was covered under the terms of the Policy. Liberty Mutual estimated the ACV of the loss and paid the Lafollettes the ACV minus a $1000 deductible. On April 8, 2014, the Lafollettes filed a putative class action against Liberty Mutual alleging that Liberty Mutual unlawfully applied a deductible to the ACV payment.

**II.  Discussion**

Liberty Mutual has moved for summary judgment because it interprets the Lafollettes' Policy to require the payment of a deductible regardless of whether the insured opts for an ACV or RCV payment for losses covered by the Policy.

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).  There is no dispute of material fact.  Therefore, the only question is whether the Lafollette's policy requires a deductible to be paid when they settled for the ACV.

**A.  Interpretation of Insurance Contracts in Missouri**

The interpretation of an insurance policy is a question of law to be determined by the Court.  *Mendota Ins. Co. v. Lawson*, 456 S.W.3d 898, 903 (Mo. Ct. App. 2015).  Missouri courts read insurance contracts "as a whole and determine the intent of the parties, giving effect to that intent by enforcing the contract as written."  *Thiemann v. Columbia Pub. Sch. Dist.*, 338 S.W.3d 835, 840 (Mo. Ct. App. 2011).  To determine the intent of the parties, the language in the contract is to be read according to its plain and ordinary meaning.  *Mendota*, 456 S.W.3d at 903.  If an ambiguity exists the policy language will be construed against the insurer.  *Id.* at 904.  "'An ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of the language of the policy.'"  *Fanning v. Progressive Northwestern Ins. Co.*, 412 S.W.3d 360, 364 (Mo. Ct. App. 2013) (quoting *Seeck v. Geico Gen. Ins. Co.*, 212 S.W.3d 129, 132 (Mo. banc 2007)).  "'To test whether the language used in the policy is ambiguous, the language is

5

considered in the light in which it would normally be understood by the lay person who bought and paid for the policy.'" *Blumer*, 340 S.W.3d at 219 (quoting *Heringer v. Am. Family Mut. Ins. Co.*, 140 S.W.3d 100, 102 (Mo. Ct. App. 2004)).

As previously explained, an insurance policy consists of the policy, the declarations, and any endorsements and definitions. *Grable v. Atlantic Cas. Ins. Co.*, 280 S.W.3d 104, 107-08 (Mo. Ct. App. 2009). "The terms and conditions of the policy are modified and altered to the extent called for by the endorsement. . . . If the language of the endorsement and the general provisions of the policy conflict, the endorsement will prevail, and the policy remains in effect as altered by the endorsement." *Id.* at 108 (quotation omitted).

### 1. Endorsements

The Lafollettes' Policy contains two relevant endorsements: the HomeProtector Plus Endorsement and the Wind/Hail Endorsement. The HomeProtector Plus Endorsement contains its own loss settlement provision which the parties agree is the controlling loss settlement provision. As previously described that loss settlement provision states in relevant part:

> 3. Loss Settlement. Covered property losses are settled as follows:
>> a. ….
>> (1) We will pay the cost of repair or replacement,. . .
>> (2) We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss according to the provisions of a.(1) above.
>> . . .
>> d. You may disregard the replacement cost provision and make a claim for loss of or damage to property on an actual cash

6

> value basis and then make claim within 180 days after loss for additional liability under this endorsement.

[Doc. 100, ¶ 13; Doc. 106, ¶ 5]. The relevant language from the Wind/Hail Endorsement is as follows:

> The following special deductible is added to the policy:
>
> With respect to the peril of Windstorm Or Hail, we will pay only that part of the total of all loss payable under Section I that exceeds the windstorm or hail deductible.
>
> The dollar or percentage amount of the windstorm or hail deductible is shown on the policy declaration
>
> . . .
>
> No other deductible in the policy applies to loss caused by windstorm or hail.

[Doc. 100, ¶ 15; Doc. 106, ¶ 7].

Liberty Mutual contends that because the Wind/Hail Endorsement limits payments on losses that exceed the windstorm or hail deductible, both ACV and RCV payments are subject to a deductible. The Lafollettes argue that there is no deductible for an ACV payment because the loss settlement provision of the HomeProtector Plus Endorsement controls and it provides for a deductible only when the RCV option is exercised.[2]

The loss settlement section of the HomeProtector Plus Endorsement contains separate provisions for RCV and ACV losses. For RCV payments, the endorsement provides that "[t]he applicable limit of liability . . . is the replacement cost, *after*

---

[2] As previously explained, the Parties agree that Section 1 of the Policy, which is referred to by the Wind/Hail Endorsement, is the loss settlement provision of the Homeprotector Plus Endorsement.

7

*application of deductible and without deduction for depreciation . . . ."* Section 3(a). Section 3(d) of the loss settlement provision states that a policyowner "may disregard the replacement cost provision [i.e. Section 3(a)] and make a claim for loss of or damage to property on an actual cash value basis and then make claim within 180 days after loss for additional liability under this endorsement." Section 3(d). Thus, the insured who is willing to accept the ACV can disregard the "replacement cost provision" which is the only section in the loss settlement provision that mentions a deductible.

The general rule of contract interpretation, *expressio unius est exclusio alterius,* is instructive here. The loss settlement provision's silence regarding an ACV deductible in the face of its explicit reference to an RCV deductible suggests the parties did not intend to make the deductible applicable to ACV payments. *See Smith v. Missouri Local Gov. Employees Retirement System*, 235 S.W.3d 578, 582 (Mo. Ct. App. 2007).

Liberty Mutual, however, argues that Section 3(a) has nothing to do with whether a deductible must be paid because it only discusses limits of liability. In other words, Section 3(a) only discusses the outside limit of what will be paid and not what will in fact be paid. The Court finds this argument unpersuasive because Section 3(a) is the loss settlement provision for the Homeprotector Plus Endorsement and an ordinary insured would reasonably conclude that a "loss settlement" provision was relevant to how their loss would be settled. A reasonable person would think that the provision included what would be paid and not just what would not be paid. *Ritchie v. Allied Prop. & Cas. Ins. Co.*, 307 S.W.3d 132, 135 (Mo. banc 2009) ("[T]his Court applies the meaning which would be attached [to the terms] by an ordinary person of average understanding if

8

purchasing insurance . . . ." (quotation omitted)). Also, if Section 3(a) only limits liability and was not intended to tell the insured what will be paid, Liberty Mutual has not identified another section of the Policy that affirmatively says what will be paid. For example, the Wind/Hail Endorsement, which Liberty Mutual says is the section that tells the insured whether a deductible must be paid, is also cast as a limitation. It says: "We will pay only that part of the total of all loss payable under Section I that exceeds the windstorm or hail deductible." Therefore, Section 3(a) is relevant to the question of whether a deductible is to be subtracted from an ACV payment. It does not matter that it is stated as a limitation on what will be paid rather than an affirmative statement of what will be paid.

That said, the Court must also consider the Wind/Hail Endorsement because the Court must give meaning to all words included in a contract and that endorsement deals specifically with deductibles for hail and wind damage. In relevant part, the Wind/Hail Endorsement states:

> With respect to the peril of Windstorm Or Hail, we will pay only that part of the total of all loss payable under Section I that exceeds the windstorm or hail deductible.

Liberty Mutual interprets this endorsement to require payment of a deductible on any loss covered by the HomeProtector Plus loss settlement provision. The Lafollettes argue that "total of all losses" refers to the RCV discussed in Section 3(a) of the loss settlement provision and not to the actual cash value discussed in Section 3(d).

First, Liberty Mutual's interpretation does not address the term "total" and therefore fails to comply with contract interpretation principles. Liberty Mutual gives no

9

explanation how the Court can ignore the word "total." Second, the Lafollettes' interpretation of the phrase "total loss" is plausible. The Wind/Hail Endorsement says that an insured can get no more than the total loss payable under Section 1 minus a deductible. Again, for purposes of this case, Section 1 refers to the HomeProtector Plus loss settlement provision. That provision has two parts. A homeowner may elect to take the ACV or make repairs and get the RCV. While a loss payable under the HomeProtector Plus loss settlement provision could refer to either an ACV or RCV payment, the Court must give meaning to the complete phrase "*total of all* loss payable." Therefore, it must consider what is the "total of all loss payable" under the HomeProtector Plus Endorsement. The total of all loss payable under the loss settlement provision of the HomeProtector Plus Endorsement is the replacement cost after application of a deductible. This is referred to as the replacement cost value. Since the RCV is the most payable under the HomeProtector Plus loss settlement provision, a reasonable person could interpret "total loss payable" in the Wind/Hail endorsement to be the RCV. In other words, the phrase "With respect to the peril of Windstorm or Hail, we will pay only that part of the total of all loss payable under Section 1 that exceeds the windstorm or hail deductible," is read synonymously to "With respect to the peril of Windstorm or Hail, we will pay only that part of the *replacement cost value* payable under the *loss settlement provision* that exceeds the windstorm or hail deductible." This interpretation is also consistent with the Court's interpretation of Section 3 of the loss settlement provision as limiting the deductible to 3(a) and excluding it from 3(d) pursuant to the doctrine of *expressio unius est exclusion alterius*. Finally, an ordinary person

10

could reasonably believe they would not be charged a deductible when they accepted actual cash value, since they were giving up replacement coverage for which they had paid a premium.

At a minimum, one thing is clear, an ordinary person of average intelligence would not be able to sort this out because the Policy and its endorsements are so inartfully drafted that they are ambiguous. Ambiguous provisions in an insurance contract are to be construed against the insurance company. *Mendota Ins. Co. v. Lawson*, 456 S.W.3d 898, 904 (Mo. Ct. App. 2015). The onus is placed on the insurance company to make the policyholder's obligations under the contract clear. Construing the ambiguous provisions of Policy against Liberty Mutual, the Lafollettes are not required to pay a deductible for ACV claims under the HomeProtector Plus Endorsement, even when the claim is for wind or hail damage.

Liberty Mutual argues that the Lafollettes' interpretation limits application of the Wind/Hail Endorsement to losses settled at replacement cost only, despite the fact that the endorsement on its face applies generally to losses caused by windstorm or hail. However, the title of the endorsement is "Windstorm or Hail Deductible." That a deductible does not apply to ACV claims does not render the endorsement moot or otherwise inhibit its functioning. The endorsement still serves a clear purpose in requiring the payment of a deductible to claims for wind or hail damage for which the policyowner elects to receive an RCV payment.

The insurance company also argues that an unpublished decision from the Washington Court of Appeals supports their contention that a deductible applies to both

11

RCV and ACV claims. *MacDonald v. Mutual of Enumclaw*, 147 Wash. App. 1046 (Wa. Ct. App. 2008), addressed an insurance policy with a term which read:

> We will pay only that part of the loss which exceeds [15%] of the amount of insurance that applies to the destroyed or damaged property. This deductible(s) will apply separately to loss under the various Section I Property Coverages.

This term is unlike that in the Lafollettes' policy, which referred to the "total of all loss under Section 1." Moreover, nothing in the *MacDonald* opinion suggests that the insurance contract which it interpreted contained provisions similar to those found in the Lafollettes' HomeProtector Plus Endorsement.

### 2. Declarations

Liberty Mutual contends that the Declarations page, which includes reference to both the general Section I deductible and $1000 windstorm or hail deductible, is sufficient to require the Lafollettes to pay a deductible on all claims. "When the declarations page clearly communicates the coverage provided by the insurance contract, and the other policy provisions neither expressly change coverage nor reflect a different intention than that clearly expressed on the declarations page, the declarations page controls." *Christensen v. Farmers Ins. Co., Inc.*, 307 S.W.3d 654, 658 (Mo. Ct. App. 2010) (quotation omitted). The relevant Declarations in the Policy read as follows:

> SECTION I AND II: COVERAGES AND LIMITS UNDER YOUR LIBERYGUARD HOMEOWNERS POLICY
>
> I: COVERAGE A – YOUR DWELLING WITH EXPANDED REPLACEMENT COST    $158,300
> . . .

12

DEDUCTIBLE: LOSSES COVERED UNDER SECTION I [of the
Policy] ARE SUBJECT TO A DEDUCTIBLE OF $1000

OTHER DEDUCTIBLES: $1000 WINDSTORM OR HAIL

[Doc. 100, ¶ 10; Doc. 106, ¶ 5]. Contrary to Liberty Mutual's argument, these provisions do not state that the Lafollettes' claim is subject to a deductible regardless of the compensation style selected.

First, the references to the deductibles contained in the Declarations do not "clearly communicate[] the coverage" of the deductibles to a policy owner's claim. On its face, nothing in the Declarations references under what circumstances either of the deductibles will be applied to a claim. The Declarations only mention that "losses covered under Section I are subject to" a deductible, and that a windstorm or hail deductible exists. How these deductibles are to be applied is set out in the remainder of the Policy.

More importantly, the Lafollettes' policy contains two endorsements. The terms of these endorsements prevail over the general policy terms, including the Declarations. *Christensen v. Farmers Ins. Co., Inc.*, 307 S.W.3d 654, 658 (Mo. Ct. App. 2010); *Grable v. Atlantic Cas. Ins. Co.*, 280 S.W.3d 104, 108 (Mo. Ct. App. 2009). As described above, the terms of the endorsements do not require the payment of a deductible on ACV claims. Any conflict between the Declarations and the endorsements is resolved in favor of the terms of the endorsements. Under the endorsements, no deductible is due on the Lafollettes' ACV claim.

13

## B. Inapplicability of General Principles of Insurance Law

Liberty Mutual makes a substantial number of arguments regarding general principles of insurance law and the policy justifications behind its interpretation of the Lafollettes' Policy. Contrary to these arguments, the Court's interpretation does not threaten to upend the insurance industry or permit the insured to determine when he or she pays the deductible under normal circumstances.

Liberty Mutual first contends that the definition of "deductible" clarifies that the Lafollettes are required to pay a deductible on both RCV and ACV claims. As noted by the insurance company, the Western District of Missouri has recognized that a deductible is "the portion of the loss to be borne by the insured before the insurer becomes liable for payment." *Western Heritage Ins. Co. v. Love.*, 24 F.Supp.3d 866, 879 (W.D. Mo. 2014). However, the definition of "deductible" does nothing to outline the circumstances under which a policyholder must pay the deductible. The circumstances under which a deductible must be paid is contained in the applicable insurance contract.

Moreover, nothing in the Court's opinion limits the circumstances under which a deductible may be applied or otherwise alters general insurance principles. The Court's task is to interpret the Lafollettes' individual insurance policy. The Lafollettes' Policy does not require them to pay a deductible if they elect to receive an ACV payment for claims arising under the Wind/Hail Endorsement. That is not to say that Liberty Mutual could not have included in the Policy a provision to require the Lafollettes to pay such a deductible. However, the terms of the contract between Liberty Mutual and the Lafollettes did not impose any such requirement with respect to ACV claims, despite

14

explicitly setting forth such a requirement with respect to RCV claims. While the Court is sympathetic to Liberty Mutual's arguments regarding the policy justifications supporting the application of a deductible to all claims, the policy considerations cannot overcome clear deficiencies in the language of the Policy at issue. The Lafollettes are bound by the terms of the contract they entered with Liberty Mutual, and the terms of that contractual bargain govern the interactions between the parties regardless of the merits of Liberty Mutual's argument that different terms would make more sense in the larger scheme of insurance bargains.

### C. Inapplicability of "Filed Rate Doctrine"

Liberty Mutual's final argument in support of its interpretation of the Lafollettes' Policy relates to the "filed rate doctrine." The filed rate doctrine prohibits plaintiffs from challenging rates charged by a regulated entity when those rates have been approved by a regulating entity. *Rios v. State Farm Fire and Cas. Co.*, 469 F.Supp.2d 727, 734 (S.D. Iowa 2007); *see also AT&T Co. v. Cent. Office Tel. Inc.*, 524 U.S. 214, 222 (1998). When determining whether the filed rate doctrine applies to a lawsuit, the Court is to look at "the impact the court's decision will have on agency procedures and rate determinations," rather than the underlying conduct of the parties. *H.J. Inc. v. Northwest Bell Telephone Co.*, 954 F.2d 485, 489 (8th Cir. 1992).

Liberty Mutual contends that the filed rate doctrine bars the Lafollettes' claim because the rates being charged for their Policy were approved by the Missouri Department of Insurance. As those rates are based on the application of the deductible to all covered losses to a dwelling, Liberty Mutual argues that the claim constitutes a

15

collateral attack on the rates approved by the Department of Insurance. This argument ignores the crux of the Lafollettes' claim, which revolves around issues of policy interpretation. The Lafollettes have not challenged the amount of their premium or the amount of the deductible where it applies and the Court has not made any findings or conclusions regarding the propriety of the means by which the insurance rates were determined or the deductible structure. No refund of any premium has been ordered. The Court's conclusions regarding the content of the Policy and the applicability of the deductible to ACV claims made pursuant to that Policy were based on simple contract interpretation and do not implicate the Department of Insurance's approval of Liberty Mutual's rate structure or the enforceability of the Lafollettes' contract with Liberty Mutual. As the Court has merely interpreted the Policy at issue and has not made any conclusions regarding the propriety of the content of the Policy or the overarching rate scheme, the filed rate doctrine is inapplicable.[3]

### III. Conclusion

For the reasons set forth above, Defendants' motion is denied.

/s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

---

[3] Liberty Mutual also suggests that it would violate R.S. Mo. § 379.356 if required to refund the ACV deductible to the Lafollettes. This statute prohibits insurance companies from giving any rebates or credits of the premium or any other special dividend payment beyond those approved by applicable findings. Here, the Lafollettes have not requested a premium refund or credit, nor have they requested "any special favor or advantage." Any relief to which the Lafollettes are entitled is the result of an overcharge under the terms of the policy and does not fall within the parameters of this statute.

Dated: October 19, 2015
Jefferson City, Missouri