**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

ERIC LAFOLLETTE and CAMILLE          )
LAFOLLETTE, individually and on      )
behalf of others similarly situated, )
                                     )          No. 2:14-cv-04147-NKL
                    Plaintiffs,      )
                                     )
            vs.                      )
                                     )
LIBERTY MUTUAL FIRE INSURANCE        )
COMPANY,                             )
                                     )
                    Defendant.       )

**ORDER**

Plaintiffs Eric and Camille Lafollette move for class certification. Doc. 155. The motion is granted. The Lafollettes' motion to strike, Doc. 170, is denied.

**I.      Background**

In January 2008, the Lafollettes' home sustained hail damage and they submitted a claim for coverage to Defendant Liberty Mutual Fire Insurance Company. The Lafollettes made their claim under the section of their Liberty Mutual policy that provided for an "actual cash value" payment for damages prior to reimbursement for repair or replacement. The dispute in this case involves Liberty Mutual's assessment of a $1000 deductible on the Lafollettes' actual cash value claim, which the Lafollettes contend should not have been assessed under the terms of the policy.

**A.  The Insurance Policy and Liberty Mutual's General Claims Handling Procedure**

Liberty Mutual homeowner's insurance policies are generally made up of three components: the declarations, the base policy language, and the endorsements. These sections work together to define the parameters of the policyholder's coverage. The declarations set out the limits on recovery under the policy, list the endorsements included in the policy, and note the

deductibles that may be assessed under the policy. The base policy language contains the standard terms of the policy. The endorsements contain additions to the policy which customize the coverage and terms of the base policy language to create the specific coverage purchased by the policyholder. The terms of the endorsements control over conflicting provisions in the declarations or base policy language. *Grable v. Atlantic Cas. Ins. Co.*, 280 S.W.3d 104, 108 (Mo. Ct. App. 2009).

When a homeowner sustains damage to their dwelling or other structure that is covered by a Liberty Mutual deluxe homeowner's insurance policy, the claim is handled and paid in two phases: (1) the actual cash value ("ACV") phase and (2) the replacement cost value ("RCV") phase. [Doc. 106-3]. This procedure is set out in the base policy,[1] which provides as follows:

> 3. Loss Settlement. Covered property losses are settled as follows:
> . . .
>> b. Buildings under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:
>>> (1) If, at the time of loss, the amount of insurance n this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:
>>> . . .
>>> (4) We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss according to the provisions of b.(1) and b.(2) above.
>>> . . .
>>> (5) You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis. You

---

[1] The Lafollettes seek to certify a class who received payments pursuant to policy Form HO 03 (Edition 04 91). Nothing in this order addresses base policy language in any other version of a Liberty Mutual policy.

- 2 -

> may then make claim within 180 days after loss for any additional liability according to the provisions of this Condition 3. Loss Settlement.

[Doc. 156-2, p. 13-14 (Lafollette Policy, Bates LMFIC000074-75)]. Most policyholders hold base policies supplemented by a variety of endorsements which provide expanded coverage beyond that which is provided in the base policy.

After the policyholder makes his or her claim, an adjustor goes to the location of the insured property to ascertain the damage. The adjustor then uses a program called "Xactimate" to put a dollar figure on the amount of the damage. The total amount of the loss is referred to as the "replacement cost." [Doc. 156-1, p. 6 (Summerlin Depo. p. 145)]. After the total amount of the loss is calculated, the adjustor inputs factors for depreciation, and the amount of depreciation is subtracted from the replacement cost to give the actual cash value of the loss. *Id.* at 6-7. Following this calculation, the policyholder is paid the ACV of the loss, minus the deductible.[2] No further payment on the claim is made unless the insured decides to repair or replace the damage to the property. The insured is not required to undertake this repair, but may take the ACV payment in satisfaction of their claim. *Id.* at 8-9. If the insured decides to repair or replace the damage and submits proof of the repairs to Liberty Mutual, the insured is entitled to recover the RCV. If the policyholder chooses to make a claim for the RCV, a separate check is written to the policyholder to compensate them for the cost the policyholder actually spent above the ACV to repair or replace their loss to account for the amount of depreciation withheld from the ACV payment.

---

[2] The propriety of the assessment of this deductible is what is disputed in this lawsuit.

- 3 -

**B. Lafollettes' Policy**

Like most Liberty Mutual policies, the Lafollettes' policy is made up the declarations, the base policy language, and the endorsements. The Lafollettes' insurance policy includes two relevant endorsements. First, it contains a Home Protector Plus Endorsement, which has its own "loss settlement" provision that provides:

> 3. Loss Settlement. Covered property losses are settled as follows:
>
>   a. The applicable limit of liability for Buildings under Coverage A or B is the replacement cost, after application of deductible and without deduction for depreciation, subject to the following:
>   (1) We will pay the cost of repair or replacement, but not exceeding:
>   . . .
>   (2) We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss according to the provisions of a.(1) above.
>   . . .
>   d. You may disregard the replacement cost provision and make a claim for loss of or damage to property on an actual cash value basis and then make claim within 180 days after loss for additional liability under this endorsement.

[Doc. 100, ¶ 13; Doc. 106, ¶ 5]. Where it applies, this loss settlement provision replaces the loss settlement provision present in the base policy language.

The Lafollettes' policy also contains a Windstorm or Hail Deductible Endorsement ("Wind/Hail Endorsement"), which states:

> The following special deductible is added to the policy:
>
> With respect to the peril of Windstorm Or Hail, we will pay only that part of the total of all loss payable under Section I that exceeds the windstorm or hail deductible.
>
> The dollar or percentage amount of the windstorm or hail deductible is shown on the policy declaration
>
> . . .

- 4 -

No other deductible in the policy applies to loss caused by windstorm or hail.

[Doc. 100, ¶ 15; Doc. 106, ¶ 7].

After the Lafollettes sustained hail damage to their home in 2008, they submitted a claim to Liberty Mutual under their policy. Liberty Mutual subsequently provided them with an ACV payment for their loss pursuant to the Wind/Hail Endorsement. Subtracted from the ACV payment was a $1000 deductible for the claim. The amount of this deductible appeared on the declarations page of the Lafollettes' policy. The Lafollettes never requested that Liberty Mutual supplement this ACV payment with an RCV payment, and to date have only retained compensation for the initial ACV payment.[3]

### C. The Proposed Class

The Lafollettes seek certification of a class of Liberty Mutual property insurance policyholders in Missouri whose ACV payments were reduced for payment of a deductible, specifically:

> All persons who received an ACV payment, directly or indirectly, from Liberty Mutual Fire Insurance Company for physical loss or damage to their dwelling or other structures located in the state of Missouri arising under policy Form HO 03 (Edition 04 91) and endorsements, such payments arising from losses that occurred from April 8, 2004 to the date of class certification, where a deductible was applied to the ACV payment for the person's dwelling or other structure (Coverage A and/or B). Excluded from the Class are: (1) All persons who received a replacement cost payment from Liberty Mutual Fire Insurance Company under Coverage A and/or B; (2) All persons whose payment(s) plus the amount of any deductible applied was less than $2,500; (3) Liberty Mutual Fire Insurance Company and its affiliates, officers, and directors; (4) Members of the judiciary and their staff to whom this action is assigned; and (5) Plaintiffs' Counsel.

---

[3] At one point Liberty Mutual sent the Lafollettes an unsolicited supplemental check for the full RCV of their claim. However, the Lafollettes returned this check.

- 5 -

## II.    Discussion

### A.    Article III Standing

Liberty Mutual argues preliminarily that Article III bars this case from proceeding as a class action because the class includes individuals who have not been injured and therefore have no standing to pursue the lawsuit. According to Liberty Mutual, there are individuals within the definition of the class who could have replaced their loss for an amount equal to or less than the ACV. Liberty Mutual, therefore reasons that because it is entitled to apply a deductible to RCV payments, any class member whose ACV payment was sufficient to replace the damaged property was not injured by Liberty Mutual taking a deductible at the ACV stage.

In order to bring a class action, the plaintiffs must have suffered an "injury in fact." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The injury must be both concrete and particularized, meaning it must actually exist and "must affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 2016 WL 2842447, at *6-7 (S. Ct. May 16, 2016).

Liberty Mutual's process for paying RCV and ACV claims reveals the underlying difference between the two types of payments, which in turn defeats Liberty Mutual's argument that a deductible can be taken even if no claim for RCV is ever made. As set out above, after the policyholder makes a claim under their policy, an adjustor visits the damaged property to assess the RCV, after which the ACV is calculated based on depreciation. Following this calculation, the policyholder is paid the ACV of the loss, minus the deductible, and Liberty Mutual makes no further payment on the claim unless the insured chooses to repair or replace the damage and submits proof of the repairs to Liberty Mutual.

Liberty Mutual's construction of the policy assumes that policyholders were obligated to seek an RCV payment upon actually repairing or replacing damage to their home and that the

- 6 -

limitations applicable to the RCV payment are equally applicable to an ACV payment. This obligation is explicitly disclaimed in the policy, which notes,

> You may disregard the replacement cost loss settlement provisions and make a claim under this policy for loss or damage to buildings on an actual cash value basis. You *may* then make claim within 180 days after the loss for any additional liability according to the provisions of this Condition 3 Loss Settlement.

[Doc. 160-1, p. 14 Bates LMFIC000075] (emphasis added). Under this provision, it is the choice of the *policyholder* whether to pursue an ACV or RCV payment. Nothing in this provision requires a policyholder to make a claim for RCV payment at any point in the process. [*See* Doc. 163-2, p. 8-9 (Depo. of Ricky Summerlin at p. 150-51)]. Once a policyholder receives an ACV payment for their loss it is not for Liberty Mutual to decide what will be done with the money. [Doc. 163-2, p. 7-8 (Depo. of Ricky Summerlin at p. 149-50)]. Nor is the payment transformed into an RCV payment simply because the policyholder chooses to repair damage to the home with the ACV payment, [*See* Doc. 163-4, p. 7-8 (Depo. of Bryan Tilden at p. 58-59)], much less because the ACV payment was sufficient to make the repairs, even though repairs are not made. If the policyholder chose not to seek the RCV payment under these circumstances, as the policy permitted them to do, the ACV payment is not effectively transformed into an RCV payment and subject to limitations only applicable to RCV payments. *See Tritschler v. Allstate Ins. Co.*, 144 P.3d 519, 529 (Ariz. Ct. App. 2006) ("[T]he determination of actual cash value is not based upon what the insured actually pays to repair or replace the damaged property. Therefore, the amount an insured ultimately spends to make needed repairs, *if any*, is irrelevant.").

Policyholders who received an ACV payment and subsequently returned to Liberty Mutual for an RCV fall outside the definition of the proposed class, which excludes "[a]ll persons who received a replacement cost payment from Liberty Mutual Fire Insurance Company

under Coverage A and/or B." These policyholders specifically sought an RCV payment, which was paid by Liberty Mutual and therefore were not harmed by any preliminary deficiency in the ACV payment.[4]

### B. Class Certification Standard

Under Federal Rule of Civil Procedure 23, a motion for class certification involves a two-part analysis. First, under Rule 23(a), the proposed class must satisfy the requirements of "numerosity, commonality, typicality, and fair and adequate representation." *Luiken v. Domino's Pizza, LLC,* 705 F.3d 370, 372 (8th Cir. 2013). Second, the proposed class must meet at least one of the three requirements of Rule 23(b). *Comcast Corp. v. Behrend,* 133 S.Ct. 1426, 1432 (2013). The Lafollettes assert that the proposed class qualifies under Rule 23(b)(3).

It is the Lafollettes' burden to show the class should be certified. *See Luiken,* 705 F.3d at 372. This burden is met only if, "after a rigorous analysis," the Court is convinced the Rule 23 requirements are satisfied. *Comcast,* 133 S.Ct. at 1432 (quoting *Wal–Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2551–52 (2011)). In the Eighth Circuit, the rigorous analysis includes examining whether the proposed class "is adequately defined and clearly ascertainable." *Sandusky Wellness Center, LLC v. Medtox Scientific, Inc.*, 2016 WL 1743037, at *3 (8th Cir. May 3, 2016) (citing *Ihrke v. N. States Power Co.,* 459 F.2d 566, 573 n.3 (8th Cir. 1972)). Rigorous analysis may further "entail some overlap with the merits of the plaintiff's underlying claim," because "[t]he class determination generally involves considerations that are enmeshed

---

[4] Liberty Mutual cites examples of three claims where the ACV was sufficient to cover the policyholder's cost of repairs. [Doc. 160-5]. The claims notes reveal that all three policyholders were engaged in ongoing discussions with their insurance agents about their repairs and costs, such that it can be reasonably inferred that these individuals made a claim for the RCV and do not fall within the parameters of the class.

- 8 -

in the factual and legal issues comprising the plaintiff's cause of action." *Wal–Mart,* 131 S.Ct. at 2551–52 (quoting *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 160 (1982)).

District courts have broad discretion in deciding whether class certification is appropriate. *Prof'l Firefighters Ass'n of Omaha, Local 385 v. Zalewski,* 678 F.3d 640, 645 (8th Cir. 2012) (citing *Rattray v. Woodbury Cnty, Iowa,* 614 F.3d 831, 835 (8th Cir. 2010)).

The Court rejects Liberty Mutual's preliminary argument concerning ascertainability. Liberty Mutual argues that ascertainability of class members is a stand-alone requirement, separate from those explicitly provided in Rule 23. *See* Doc. 161, pp. 19-20. In *Sandusky*, the Eighth Circuit recently explained that whether the proposed class is clearly ascertainable is a question that must be answered as part of the rigorous analysis performed under Rule 23. 821 F.3d at 996. However, the Eighth Circuit has not "outlined a requirement of ascertainability" or treated ascertainability "as a preliminary requirement." *Id.* "'It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable.'" *Id.* (quoting *Ihrke v. N. States Power Co.,* 459 F.2d 566, 573 n.3 (8th Cir. 1972), *vacated due to mootness*, 409 U.S. 815 (1972)). Therefore, Liberty Mutual's arguments concerning ascertainability will be addressed below in connection with Rule 23's explicit requirements, rather than as a stand-alone requirement.

According to Liberty Mutual, in order to be ascertainable it must be administratively feasible to identify members of the proposed class. In *Sandusky,* the Eighth Circuit expressly acknowledged the circuits' divergent views of the meaning of ascertainability. The Eighth Circuit noted, for example, that the Third Circuit uses a "heightened test," requiring a plaintiff to show the class is defined with reference to objective criteria, and that there is "'a reliable and administratively feasible mechanism for determining whether putative class members fall within

- 9 -

the class definition.'" 821 F.3d at 995 (citing *Byrd v. Aaron's Inc.,* 784 F.3d 154, 163 (3rd Cir. 2015)). The Eighth Circuit also observed that the Seventh Circuit took the opposite approach. *Id.* at 996. Rejecting the Third Circuit's test, the Seventh Circuit has held that Rule 23 neither "'mentions [n]or implies this heightened requirement under Rule 23(b)(3) . . . . The policy concerns motivating the heightened ascertainability requirements are better addressed by applying carefully the explicit requirements of Rule 23(a) and especially [Rule 23] (b)(3).'" *Id.* (citing *Mullins v. Direct Digital, LLC,* 795 F.3d 654. 659 (7th Cir. 2015)).

The *Sandusky* court then proceeded to examine whether the class proposed there was ascertainable according to objective criteria, and concluded it was. *Id.* at * 997-98.[5] It did not apply any heightened ascertainability standard as advocated by the defendant there. Nor did it examine, or even mention, administrative feasibility in connection with ascertainability. Accordingly, this Court will not use the administrative feasibility test in connection with consideration of ascertainability.[6]

---

[5] *Sandusky* was a class action brought under the Telephone Consumer Protection Act, concerning the defendants' practice of sending facsimiles advertising their services, but failing to include opt-out notices. The TCPA prohibits sending an unsolicited fax advertisement to a recipient. The district court denied class certification on the basis that persons in the class could not be objectively established and the class was therefore not ascertainable.

The Eighth Circuit reversed. The court held that the best objective indicator of the recipient of a fax is the person who subscribes to the fax number. "True, the subscriber to the fax number may not be the recipient of the fax. However, fax logs showing the numbers that received each fax were objective criteria making recipients clearly ascertainable." *Sandusky,* 821 F.3d at 997 (citing, *inter alia*, *Chapman v. Wagener Equities, Inc.,* 747 F.3d 489, 492 (7th Cir. 2014) (affirming class certification in a TCPA class action involving over ten thousand persons and explaining that recipients "of faxes who don't have rights under the [TCPA] just wouldn't be entitled to share in the damages awarded to the class by a judgment or settlement"). Accordingly, the Eighth Circuit held the district court had abused its discretion in denying class certification. *Id.* at 998.

[6] Nonetheless, adequacy of the class definition and ascertainability of class members according to objective criteria are addressed below in conjunction with predominance.

- 10 -

### C.     Rule 23(a)

#### 1.     Numerosity

Rule 23(a)(1) requires that the class be sufficiently numerous such that joinder of all members would be impracticable. In assessing whether the numerosity requirement has been met, courts examine factors such as the number of persons in the proposed class, the nature of the action, the size of the individual claims, and the inconvenience of trying individual claims. *Paxton v. Union Nat'l Bank,* 688 F.2d 552, 561 (8th Cir. 1982). In removing this case from state court, Liberty Mutual noted that it issued approximately 91,000 insurance policies in Missouri and insureds made approximately 8,300 claims for losses. Deductibles were taken on the majority of those claims. Plaintiffs' experts estimate that the size of the class is approximately 1,794. [Doc. 156-5, p. 10 (Gibson Report, ¶ 38)]. The size of the individual claims would make individual suits impracticable. Numerosity is satisfied here.[7]

#### 2.     Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." A plaintiff must show that the claims "depend upon a common contention" that "is capable of class wide resolution," such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal–Mart,* 131 S.Ct. at 2551. But commonality "'does not require that every question of law or fact be common to every member of the class . . . and may be satisfied, for example, where the question of law linking the class members is substantially related to the resolution of the litigation even though the individuals are not identically situated.'" *Downing v. Goldman Phipps PLLC*, 2015 WL 4255342, at *4 (E.D. Mo. July 14, 2015) (quoting *Paxton,* 688 F.2d at 561). Commonality is

---

[7] Liberty Mutual does not contest that numerosity is satisfied here.

easily satisfied in most cases. *See Wineland v. Casey's General Stores, Inc.*, 267 F.R.D. 669, 674 (S.D. Iowa 2009) ("The burden imposed by [the commonality] requirement is light and easily met in most cases.") (citing *In re Hartford Sales Practices Litig.*, 192 F.R.D. 592, 603 (D. Minn. 1999) and Newberg on Class Actions § 3:10 (4th ed.)).

Commonality is satisfied here.  All class members' claims revolve around the same question of whether Liberty Mutual properly assessed a deductible on the policyholders' ACV claims.  The Lafollettes seek to certify a class of plaintiffs who all received ACV payments for physical loss or damage to their dwelling or other structures in Missouri under policy Form HO 03 (Edition 04 91).  As Rule 23(a)(2) requires only one common issue of law or fact among class members, this issue alone is sufficient to meet the commonality requirement.  *Wal-Mart*, 131 S.Ct. at 2556 ("We quite agree that for the purposes of Rule 23(a)(2) 'even a single common question' will do."); *see also DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995) ("The Crehans claim that the differing types of mortgage contracts give rise to different claims that call for different treatment through subclasses.  The fact that individuals with different mortgage forms will have RESPA or contract claims of differing strengths does not impact on the commonality of the class as structured, however.").  The breadth of issues relevant to this case are further discussed below in conjunction with Rule 23(b)(3)'s predominance requirement.[8]

### 3.    Typicality

The typicality requirement is met when the claims or defenses of the representative party are typical of those of the class.  Rule 23(a)(3).  The requirement "is fairly easily met so long as other class members have claims similar to the named plaintiff." *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995).  In determining typicality, courts consider whether the named

---

[8] Liberty Mutual does not directly contest that the proposed class meets Rule 23(a)(2)'s commonality requirement, but argues that common questions do not predominate.

- 12 -

plaintiff's claim "arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Alpern v. UtiliCorp United, Inc.,* 84 F.3d 1525, 1540 (8th Cir. 1996).

Like the remainder of the putative class, the Lafollettes had a deductible subtracted from the ACV payment they received from Liberty Mutual for their claim. Liberty Mutual recognizes that it commonly subtracts deductibles from ACV payments, and this practice is what is at issue in the lawsuit.

The Lafollettes' claim was paid pursuant to the Home Protector Plus Endorsement and Wind/Hail Endorsement addendums to the base policy language. However, they contend that a class should be certified including individuals with policies which may or may not have had these endorsements and may have been subject to additional endorsements. This expansive class definition does not preclude typicality for a number of reasons. First, all members of the putative class are subject to the same base policy language. Second, the proposed class is limited to Missouri policyholders to whom the same legal standards and methods of contract interpretation apply. Finally, as discussed more fully below in conjunction with the predominance inquiry, the varying endorsements can be addressed through the designation of subclasses, when necessary. The common theory surrounding the breach of contract claim, identical base policy terms, and common legal framework surrounding the class members' claims distinguish this case from the cases cited by Liberty Mutual to support its contention that the Lafollettes are not typical of the class. *Cf. Gustafson v. BAC Home Loans Servicing LP*, 294 F.R.D. 529, 542-43 (C.D. Cal. 2013) (noting that the contracts contained numerous material variations of the provisions serving as the basis of the breach of contract claim and that the plaintiffs sought to certify a nationwide class which compounded the disparities among class members); *Duchardt v. Midland Nat. Life*

*Ins. Co.*, 265 F.R.D. 436, 445-48 (S.D. Iowa 2009) (concluding that though the variance in the terms in the contracts could be cured by narrowing the proposed classes or creating separate subclasses, typicality was lacking because different legal standards would need to be applied to the breach of contract claims); *Walls v. Sagamore Ins. Co.*, 2009 WL 890528, at *6-7 (W.D. Ark. March 31, 2009) (concluding that the representative plaintiff was not typical because her non-accident claims were not similar to the claims of class members with accident claims).

Liberty Mutual also contends that the Lafollettes are not typical of the class because they actually repaired their hail damage for an amount equal to or less than the amount they received from Liberty Mutual in the ACV payment. As noted above, this argument ignores the policy terms which give the policyholder the choice of whether or not to pursue an RCV claim after receiving an ACV payment. Therefore, the Lafollettes' decision to repair their property with the ACV payment does not preclude typicality.

### 4. Adequacy

Rule 23(a)(4) requires that the class representative and class counsel will "fairly and adequately protect the interests of the class." The adequacy requirement is met where: "1) the representatives and their attorneys are able and willing to prosecute the action competently and vigorously; and 2) each representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge." *Carpe v. Aquila, Inc.*, 224 F.R.D. 454, 458 (W.D. Mo. 2004) (internal quotes omitted). The requirement of adequacy "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 625 (1997).

The Lafollettes seek the same ACV deductible reimbursement for themselves and the class. Furthermore, the proposed class counsel has extensive experience prosecuting class

actions, and will vigorously represent the plaintiffs in this action. Neither party has suggested that class counsel is incapable of litigating this action.

Liberty Mutual argues that the Lafollettes cannot be adequate class representatives for a number of reasons. First Liberty Mutual contends that the Lafollettes are not representative of the class because they received a replacement cost payment for their repairs in a separate check.[9] Even though the Lafollettes returned the RCV check received from Liberty Mutual, the company contends that receipt of the check means they fall outside of the definition of the class.

Liberty Mutual's decision to mail the Lafollettes a check for the RCV of their damage does not moot their claim or make the Lafollettes unrepresentative of the remainder of the class. Liberty Mutual attempted to moot the Lafollettes' claim once before by presenting them a Rule 68 offer of judgment. The Court concluded that the offer did not moot the Lafollettes' claim and struck the offer of judgment. [*See* Doc. 70]. As with the offer of judgment, it would be improper to conclude that the RCV check satisfied the Lafollettes' claim where the check was not sought by the Lafollettes and was clearly made in an attempt to prevent the Lafollettes from litigating this action on behalf of the putative class.

Furthermore, the Court will not interpret the proposed class definition to exclude the Lafollettes from the class simply because they received a replacement cost check which they did not solicit and chose not to keep. The Court "has the authority to redefine a proposed class in such a way as to allow the class action to be maintained," and in this case will redefine the exclusion "received a replacement cost payment from Liberty Mutual Fire Insurance Company

---

[9] Liberty Mutual also continues to advance its theory that the Lafollettes are not in the same position as those class members whose ACV payments did not represent the full cost of their repairs. As the Court has already found that an individual's decision to complete repairs with the ACV payment has no bearing on standing or whether a deductible could be applied to the ACV payment, the distinction also does not prevent the Lafollettes from being adequate class representatives.

under Coverage A and/or B" to "submitted a claim for and received a replacement cost payment from Liberty Mutual Fire Insurance Company under Coverage A and/or B." *In re Zurn Pex Plumbing Prods. Liability Litig.*, 267 F.R.D. 549, 558 (D. Minn. 2010).

Liberty Mutual also argues that the Lafollettes are not adequate class representatives because they have interests which conflict with those of other class members. First, Liberty Mutual contends the Lafollettes' claim is adverse to the interests of class members who are current Liberty Mutual policyholders who would be harmed by rate increases necessitated by the Lafollettes prevailing in this lawsuit. However, Liberty Mutual may not unilaterally increase their insurance rates; any rate increase must be approved by the Missouri Department of Insurance. Therefore, whether any rate increase would be permitted is unclear. Moreover, Liberty Mutual has presented no evidence about how many putative class members are still policyholders, such that they would experience the alleged rate increases. As Liberty Mutual stopped writing the policy at issue in December 2008, it is likely that many putative class members are no longer insured through Liberty Mutual. There is also no evidence about the amount of the individual rate increases purportedly necessitated if the Lafollettes prevail in this case.[10] As Liberty Mutual insures tens of thousands of individuals who would experience any

---

[10] All of these factors distinguish this case from *Pipes v. Life Investors Ins. Co. of America*, 254 F.R.D. 544, 550 (E.D. Ark. 2008). In *Pipes*, the representative plaintiff had a conflict of interest with putative class members, all of whom had cancer only health insurance policies which provided that the defendant could increase premiums for all policies in a particular policy class. Defendant presented evidence that the premium increases necessitated by the plaintiffs prevailing in the lawsuit would likely result in larger than market premium increases, and that the millions of dollars in extra premium rate increases would make the policies less affordable or unaffordable for a large number of policyholders. In this case, Liberty Mutual has presented no evidence about specific rate increases which would be necessitated or the scope of individuals on whom the premium increases would be assessed. There is no evidence that the amount of any rate increase would be prohibitive for class members who continue to hold Liberty Mutual policies. Therefore, there is no reason for the Court to believe the Lafollettes are inadequate representatives.

- 16 -

rate hike brought about by a damages award in this case, it seems unlikely that any affected class members would experience individual rate increases significant enough to create a conflict of interest. Such a speculative conflict is insufficient to preclude class certification. *See e.g. Reynolds v. National Football League*, 584 F.2d 280, 286 (8th Cir. 1978) ("No evidence on which a finding of improper actions of actual conflict of interest on the part of the named plaintiffs or their counsel has been presented. All that has been shown here is that while all class members were interested in damages only some were economically interested in future player movement restrictions. Divisions of this type are insufficient to preclude class action treatment or settlement.").

Second, Liberty Mutual contends that in many instances the difference between a policyholder's ACV payment and subsequent RCV payment is less than the amount of the deductible, in which case a policyholder seeking RCV payment would be required to pay back the difference between the RCV payment minus deductible, and the ACV payment. The definition of the class makes clear that this conflict will never occur. The class only includes "persons who received an ACV payment . . . where a deductible was applied to the ACV payment." Under this definition, all class members have already been charged a deductible. There is no evidence a policyholder's deductible for an RCV claim is ever different from the deductible for an ACV claim. Therefore, it is unpersuasive for Liberty Mutual to suggest that a member of the class would ever have to pay Liberty Mutual money to make an RCV claim as they would not be in the class if they had not already paid a deductible on the initial ACV claim.

Finally, Liberty Mutual contends that the Lafollettes are impermissibly attempting to force class members to give up future RCV claims on the losses for which they have received ACV payments. This contention is also incorrect. Nothing in the class definition prohibits a

- 17 -

class member from seeking an RCV payment. *Cf. Standard Fire Ins. Co. v. Knowles*, 133 S.Ct. 1345, 1349 (2013) (noting that "a plaintiff who files a proposed class action cannot legally bind members of the proposed class *before the class is certified*" (emphasis added)); *Henke v. Arco Midcon, L.L.C.*, 2014 WL 982777, 11 (E.D. Mo. March 12, 2014) (holding that plaintiff was an inadequate representative where he failed to seek full recovery by splitting out personal injury, property damage, and/or injunctive relief claims)). If a class member sought such a payment after the resolution of this lawsuit,[11] the deductible on the RCV claim would simply be offset by any deductible paid on the ACV claim, whether paid properly or not.

### D.    Rule 23(b)(3)

To certify the class, the Lafollettes must further prove they meet the requirements of Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and [that] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

#### 1.    Predominance

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem,* 521 U.S. at 623. In other words, it "goes to the efficiency of a class action as an alternative to individual suits." *Ebert v. Gen. Mills, Inc.*, 2016 WL 2943193, at *4 (8th Cir. May 20, 2016) (*Parko v. Shell Oil, Co.,* 739 F.3d 1083, 1085 (7th Cir. 2014)). The requirement  is not satisfied if "individual questions . . . overwhelm the questions common to the class." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*

---

[11] The Lafollettes note that it is exceedingly unlikely that any such claim will be made as no claims under the relevant edition of the policy could have occurred after December 31, 2009, as the policy relevant to the class was discontinued at the end of 2008 and the ACV provisions in the policy require that requests for RCV payments be made within 180 days after the loss. Therefore, the Court concludes that there is little or no risk of any class member seeking an RCV payment under the relevant policy at any time from now into the future.

133 S.Ct. 1184, 1196 (2013). The Eighth Circuit articulates the test as follows:

> When determining whether common questions predominate, a court must conduct a limited preliminary inquiry, looking behind the pleadings, but that inquiry should be limited to determining whether, if the plaintiff's general allegations are true, common evidence could suffice to make out a prima facie case for the class. While limited in scope, this analysis should also be rigorous.

*Luiken, LLC*, 705 F.3d at 377 (8th Cir. 2013) (internal quotation and citation omitted). *See also*

*Blades,* 400 F.3d at 566-67 (same). This inquiry is "far more demanding" than that conducted to

establish commonality under Rule 23(a). *Amchem*, 521 U.S. at 623-24. For the reasons

discussed below, the Court concludes common questions predominate.

The elements of a claim for breach of contract are straightforward. A plaintiff must

establish:

> 1) the existence and terms of a contract; 2) the plaintiff's performance or tender of performance pursuant to the contract; 3) the defendant's breach of the contract; and 4) damages suffered by the plaintiff.

*Truman Bank v. New Hampshire Ins. Co.*, 370 S.W.3d 675, 676 (Mo. Ct. App. 2012) (citing

*Keveney v. Mo. Military Acad.,* 304 S.W.3d 98, 104 (Mo. 2010) (en banc).

The bulk of the evidence on the breach of contract question will be able to be considered

on a class wide basis. All class members are subject to the same base policy. Though there is

some variance in the specific endorsements which apply to each class member's policy, the

Court can address these distinctions through the creation of subclasses as discussed below. The

remainder of the evidence on the breach of contract claim can be easily aggregated. The class

definition is specifically limited to policyholders receiving ACV payments for loss of their

dwelling or other building who had a deductible taken by Liberty Mutual. The fact that the class

members received an initial ACV payment is strong evidence that they all tendered performance

as required, and the assessment of a deductible by Liberty Mutual is the breach alleged by the Lafollettes. Detailed individual inquiries will be largely unnecessary to evaluate the prima facie case.

Liberty Mutual contends that the Lafollettes cannot demonstrate that common questions predominate because the class members are subject to different policy terms. While all class members are subject to the same base policy terms, class members have policies amended by numerous different endorsements which may alter the base policy allowances.[12] As insurance policies must be interpreted as a whole, Liberty Mutual contends that these differences preclude certification. *Mendota Ins. Co. v. Lawson*, 456 S.W.3d 898, 903 (Mo. Ct. App. 2015). As discussed below, these varying policy terms do not defeat predominance.

### a. The Base Policy and Home Protector Plus Endorsement

As previously noted, all class members are subject to the same base policy language. Some class members also have a Home Protector Plus Endorsement, which replaces the base policy language relevant to this lawsuit where it applies.

The base policy Form HO 03 (Edition 04 91) contains the following Loss Settlement provision which addresses how RCV and ACV claims will be paid under the policy. It states in relevant part:

---

[12] Liberty Mutual contends that the Lafollettes are attempting to certify a class of plaintiffs who have base policies beyond Form HO 03 (Edition 04 91) because their expert was provided with a sample of class claims including base policies other than this specific form. This argument does not preclude certification. The proposed class definition clearly limits members to those with policy Form HO 03 (Edition 04 91). Moreover, the Lafollettes argue that the only reason other policies were included in the sample provided to the expert was that Liberty Mutual provided these claims files in discovery when the Lafollettes requested the Form HO 03 (Edition 04 91) policy files. The fact that the Lafollettes may have been provided extra claims files in discovery which do not meet the class definition is irrelevant to the predominance inquiry, as it is clear that it is possible to identify the putative class members with claims falling within the proposed class definition. The Lafollettes' arguments regarding the information produced in discovery is further discussed at Section III below in connection with their motion to strike.

- 20 -

3. Loss Settlement. Covered property losses are settled as follows:

. . .

    b. Buildings under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:

        (1) If, at the time of loss, the amount of insurance n this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:

        . . .

        (4) We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss according to the provisions of b.(1) and b.(2) above.

        . . .

        (5) You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis. You may then make claim within 180 days after loss for any additional liability according to the provisions of this Condition 3. Loss Settlement.

[Doc. 156-2, p. 13-14 (Lafollette Policy, Bates LMFIC000074-75)]. In policies amended by the Home Protector Plus Endorsement, the above provision may be replaced by the following if prerequisites[13] are met:

3. Loss Settlement. Covered property losses are settled as follows:

    . . .

    a. The applicable limit of liability for Buildings under Coverage A or B is the replacement cost, after application of deductible and without deduction for depreciation, subject to the following:

        . . .

        (2) We will pay no more than the actual cash value of the damage until actual repair or replacement is complete.

---

[13] Policyholders are required to notify Liberty Mutual within 90 days of the start of any additions, alterations or improvements to the dwelling which will increase the replacement cost of the dwelling by $5000 or more. [Doc. 156-2, p. 22 (Lafollette Policy, Bates LMFIC000083)].

- 21 -

> Once actual repair or replacement is complete, we will settle the loss according to the provisions of a.(1) above.
> . . .
>
> d.     You may disregard the replacement cost provision and make a claim for loss of or damages to property on an actual cash value basis and then make claim within 180 days after loss for additional liability under this endorsement.

[Doc. 156-2, p. 22-23 (Lafollette Policy, Bates LMFIC000083-84)].

Though the Loss Settlement language of the Home Protector Plus Endorsement replaces the Loss Settlement language of the base policy in cases in which it applies, this does not preclude predominance or class certification as the provisions are functionally identical. Both provisions state that the RCV will be paid "after application of deductible and without deduction for depreciation." They go on to state "We will pay no more than the actual cash value of the damage until actual repair or replacement is complete." Finally, they state "You may disregard the [RCV] provision[] and make [a] claim [] for loss [] or damage[s] to [property] on an actual cash value basis [and] then make claim within 180 days after loss for [] additional liability . . . ." There are no substantive differences in the language of the base policy and the Home Protector Plus Endorsement related to how the deductible is to be applied.

As all putative class members' claims are based on the overarching common question of whether Liberty Mutual's policy Form HO 03 (Edition 04 91) permits Liberty Mutual to collect a deductible on ACV claims, the predominance requirement is satisfied.[14]  *See In re Checking*

---

[14] Liberty Mutual contends that the base policy's differing loss settlement rules depending on whether the amount of insurance on the damaged building is more or less than 80% of the replacement cost necessitates individualized fact discovery. However, it is unclear why this provision would necessitate individualized inquiries. The loss settlement rules appear in the base policy, which applies to all class members and can be interpreted for the full class. It is also unclear why any expanded limits and no co-insurance requirements in the Home Protector Plus Endorsement would necessitate individualized inquiries, as each claim has already been processed by Liberty Mutual, and at this point there should be no need to assess the validity of the class members' individual claims, which Liberty Mutual necessarily already evaluated and

*Account Overdraft Litig.,* 286 F.R.D. 645, 656 (S.D. Fla. 2012) (where standardized "corporate policies . . . 'constitute the very heart of the plaintiffs' . . . claims,' . . . common issues will predominate because those policies would necessarily have to be reproven by every plaintiff"); *see also* 1 McLaughlin on Class Actions § 5:56 (12th ed., updated Dec. 2015) ("Breach of contract claims arising out of a standardized, form contract ordinarily are suitable for class certification unless numerous inquiries are required to determine whether a breach of the contract occurred as to each class member.").  All class members' policies contain identical base policy language, some of which have been amended by the Home Protector Plus Endorsement.  As the Court has concluded that the Loss Settlement provision of the Home Protector Plus Endorsement is functionally identical to the Loss Settlement provision of the base policy to the extent the provisions address deductibles on ACV claims, there is no need to distinguish between policies which are amended by the Home Protector Plus Endorsement and those which are not.  At minimum, it is appropriate to certify the question of how deductibles may be assessed on ACV claims under these Loss Settlement provisions.

Liberty Mutual argues that as each class member's policy may contain different endorsements, it is impossible to interpret the base policy for the class as a whole because the different endorsements contained within each policy may affect how the ACV deductible is applied under the base policy.  The parties have identified four endorsements which may affect how the base policy ACV deductible may be applied: (1) the Home Protector Plus Endorsement, (2) the Wind/Hail Endorsement; (3) the Functional Replacement Cost Loss Settlement

---

paid to all class members.  If the claims had been found preliminarily deficient by Liberty Mutual, no payment would have been made and the individual would not be a member of the class.

Endorsement; and (4) the Earthquake Endorsement. The latter three of these endorsements are discussed more fully below.

Liberty Mutual has not identified any provision in an endorsement other than those listed above which bears on the interpretation of the ACV provisions in the base policy. Instead, Liberty Mutual contends that it is the Lafollettes' burden to establish that none of the other endorsements will affect the interpretation of the ACV provisions. It would be wholly unreasonable to require the Lafollettes to discuss in the class certification motion every provision in every potential endorsement which could be contained within a class member's policy to demonstrate that it does not affect how deductibles may be applied to ACV claims under the base policy. In its briefing Liberty Mutual had the opportunity to identify examples of provisions in other endorsements which could affect how deductibles may be applied to ACV claims under the base policy. However, Liberty Mutual identified no example of any such provision. While the Lafollettes have the burden of proof to establish that class certification is appropriate, it is common sense that Liberty Mutual may not defeat class certification by making claims unsupported by evidence, particularly given that Liberty Mutual wrote the policies at issue and is thus the party with the most familiarity with the policy terms and in the best position to identify provisions which support their argument.

Moreover, Liberty Mutual's own briefing in support of its summary judgment motion reinforces the Court's conclusion that such provisions likely do not exist. When Liberty Mutual sought to construe the loss settlement provisions and Wind/Hail Endorsement in the Lafollettes' policy, it did so relying exclusively on the terms of these provisions and entirely ignored the approximately eleven other endorsements in the Lafollettes' policy.

- 24 -

### b. Other Endorsements

While the Court has established that it is possible to interpret the base policy and Home Protector Plus Endorsement for the entirety of the class, this interpretation will not afford relief to the entirety of the class. As discussed above, in addition to the base policy and Home Protector Plus Endorsement, the parties have identified three other endorsements which provided expanded coverage to some of the class members. These other endorsements are: (1) the Wind/Hail Endorsement; (2) the Functional Replacement Cost Loss Settlement Endorsement; and (3) the Earthquake Endorsement. In cases in which a class member made a claim for coverage afforded by one of these endorsements, the endorsement, rather than the base policy language, controls the scope of the coverage and recovery the class member is entitled to. *Grable v. Atlantic Cas. Ins. Co.*, 280 S.W.3d 104, 107-08 (Mo. Ct. App. 2009).

Liberty Mutual argues that these endorsements defeat predominance because the Court must interpret each of the relevant endorsements separately to determine the available coverage and deductible structure under the terms of the endorsements. Liberty Mutual is correct that these endorsements will require separate interpretation in order to afford relief to the entire class. However, this does not defeat predominance. Rule 23(c)(5) provides a mechanism for certifying classes such as this where common issues predominate, but it is necessary to make some distinctions among class members. The Rule states that "[w]hen appropriate, a class may be divided into subclasses that are each treated as a class under this rule." "A court is not bound by the class definition proposed in the complaint," *Smith v. Brown & Williamson Tobacco Corp.*, 174 F.R.D. 90, 92 n.2 (W.D. Mo. 1997) (citation omitted), and "has the authority to redefine a proposed class in such a way as to allow the class action to be maintained," *In re Zurn Pex Plumbing Prods. Liability Litig.*, 267 F.R.D. 549, 558 (D. Minn. 2010). This authority permits

the Court to create subclasses sua sponte. Newberg on Class Actions § 7:30 (5th ed.). Moreover, "[t]he Court is not obligated to create subclasses at the class certification stage of the litigation, but retains the 'flexibility to certify subclasses as the case progresses and as the nature of the proof to be developed at trial becomes clear.' *Marisol A.*, 126 F.3d at 379. Pursuant to Rule 23(c)(1), class certification 'may be altered or amended' at any time 'before the decision on the merits.' Fed. R. Civ. P. 23(c)(1)." *In re Deutsche Telekom Ag Securities Litigation*, 229 F.Supp.2d 277, 283 (S.D.N.Y. 2002).

As discussed above, the base policy and Home Protector Plus Endorsement can be analyzed jointly at the outset. The other three endorsements require individual interpretation where they are relevant to the losses sustained and claims submitted by the policyholders. The Court will preliminarily certify four subclasses:

(1)  All parties who received an ACV payment for loss arising solely[15] under the base policy and/or Home Protector Plus Endorsement;

(2)  All parties who received an ACV payment for loss arising under the Wind/Hail Endorsement;

(3)  All parties who received an ACV payment for loss arising under the Functional Replacement Cost Loss Settlement Endorsement; and

(4)  All parties who received an ACV payment for loss arising under the Earthquake Endorsement.

---

[15] "Solely" refers only to losses falling within the scope of the overall class definition; that is, ACV payments for physical loss or damage to their dwelling or other structures. The fact that a party may have received additional payment for loss of personal property or other losses falling within the scope of the policy is irrelevant to whether the class member fits the scope of subclass 1 if the class member received an ACV payment for physical loss or damage to their dwelling or other structure based on the base policy language or Home Protector Plus Endorsement without consideration of any other endorsements.

Each subclass must individually meet the requirements for class certification under Rule 23. *Paxton v. Union Nat. Bank*, 688 F.2d 552, 559 (8th Cir. 1982); Fed. R. Civ. P. 23(c)(5) ("[A] class may be divided into subclasses *that are each treated as a class under this rule*." (emphasis added)); § 1790 Partial Class Actions and Subclasses, 7AA Fed. Prac. & Proc. Civ. § 1790 (3d ed.) ("When subclasses are formed under subdivision [(c)(5)], each subclass must independently meet the requirements of Rule 23."). As the Court has permitted the parties to delay comprehensive analysis of the class and instead permitted submission of the class certification motion on the basis of a representative sample of the class, it is unclear how many class members fall within the scope of each of these subclasses. If the Court later determines that an identified subclass contains an insufficient number of claims to satisfy Rule 23's numerosity requirement, the subclass may later be decertified.[16] *Hervey v. City of Little Rock*, 787 F.2d 1223, 1227 (8th Cir. 1986) ("The court's duty to assure compliance with Rule 23(a) continues even after certification, and its decertification of the subclasses in this case must be upheld absent an abuse of discretion." (citations omitted)); Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."). Moreover, if further analysis of the class reveals additional endorsements which require independent interpretation, subclasses may be added. *Id.*

---

[16] The Court could also decertify a subclass which fails to meet any of Rule 23's other requirements. However, the Court concludes preliminarily that these classes will satisfy Rule 23's other requirements. As discussed throughout the remainder of this order, this lawsuit revolves around common predominating questions regarding the propriety of assessing deductibles on ACV payments made to class members under the base policy. There do not appear to be any conflicts of interest among the members of the subclasses which would require independent representation for the subclasses or indicate that a single subdivided class action is not the superior method of adjudication for this cause of action. The proposed class is not the sort of class that will result in winners and losers. *See Duchardt v. Midland Nat. Life Ins. Co.,* 265 F.R.D. 436, 449-50 (S.D. Iowa 2009) (finding that the proposed named plaintiffs would be inadequate class representatives where the remedies they sought would fail to benefit up to half of the class members, while benefitting the others).

The Court's experience interpreting the Lafollettes' policy in the summary judgment motion suggests that these subclasses will not make this case unmanageable. When addressing Liberty Mutual's motion for summary judgment, the Court looked to the terms of the Wind/Hail Endorsement to determine how the ACV deductible applied, and was then required to interpret the Loss Settlement provision in the Home Protector Plus Endorsement because the Wind/Hail Endorsement required the Court to determine the "total of all loss payable under Section I." [*See* Doc. 115, p. 9-10]. This same analysis[17] can be applied to the remainder of the Wind/Hail subclass.

A brief review of the Functional Replacement Cost Loss Settlement Endorsement, [Doc. 160-11, p. 7-8], and Earthquake Endorsement, [Doc. 160-11, p. 25], suggests that the interpretation of these endorsements will be simpler than the analysis of the Wind/Hail Endorsement was. Neither of these endorsements appears to require the Court to interpret the Loss Settlement provisions in conjunction with the endorsements' terms. The Functional Replacement Cost Loss Settlement Endorsement states that where it applies, "item 3.b Loss Settlement is deleted and replaced" by a provision in the endorsement. [Doc. 160-11, p. 7]. The Earthquake Endorsement contains a "deductible provision [which] replaces any other deductible provision in this policy with respect to loss covered under this endorsement." [Doc. 160-11, p. 25]. As these endorsements appear to contain deductible provisions which may be interpreted based solely on their own terms, the Court is confident that it is possible to interpret these

---

[17] As the Court has already decided that the base policy Loss Settlement provision is functionally identical to the Home Protector Plus Loss Settlement provision, the Court will not need to reinterpret the Wind/Hail Endorsement even for those class members with policies which do not contain the Home Protector Plus Endorsement.

endorsements for the subclasses, such that all class members with claims arising under policy Form HO 03 (Edition 04 91) may receive relief.[18]

As the endorsements are only relevant to the extent the policyholder's loss is covered by the terms of the endorsements, the Court need not concern itself with distinguishing among all possible combinations of endorsements which together create the full scope of a class member's policy.[19] There is no evidence that any endorsements other than the Home Protector Plus Endorsement, Wind/Hail Endorsement, Functional Replacement Cost Loss Settlement Endorsement, and Earthquake Endorsement bear on the applicability of a deductible to the ACV claims at issue in this lawsuit. Should the parties identify another relevant endorsement, the Court can address the new endorsement by creating an additional subclass.[20]

---

[18] The self-contained language of these endorsements also suggests that the language of other endorsements will be irrelevant to their interpretation. As discussed above in relation to the base policy language, absent evidence that provisions in other endorsements could bear on the interpretation of the relevant endorsements, the Court concludes that predominance is not defeated by the existence of other irrelevant endorsements.

[19] The Court also need not concern itself with variable use of the word "deductible" throughout the Home Protector Plus Endorsement, the base policy, or the declarations. First, as noted above, all class members have the same underlying base policy which is identical. As such, there is no risk that the term deductible is being applied differently in the base policy language. There is also no evidence that the language of the declarations page varies among class members beyond numeric differences in the valuation of the policyholders' property and the amount of the applicable deductibles. All the evidence presented to date suggests that these policies can be comprehensively analyzed. Moreover, in Liberty Mutual's summary judgment motion it relied exclusively on the above provisions to interpret the ACV provisions of the Lafollettes' base policy and Home Protector Plus Endorsement. Therefore, the Court finds it exceedingly unlikely that there are a significant number of other relevant provisions in these documents.

[20] Liberty Mutual's concerns about uncovering a breadth of relevant endorsements are further mitigated by the fact that the Lafollettes restricted their proposed class to persons receiving ACV payments for "physical loss or damage to their dwelling or other structures." Thus, all endorsements and other base policy provisions which relate to personal property are by definition irrelevant.

- 29 -

### c. Administrative Feasibility

Liberty Mutual also argues that it is not administratively feasible to undertake a file-by-file review of its records to identify the putative class members. However, Liberty Mutual's own expert's testimony indicates that the individual file review is not nearly as arduous as the company makes it out to be. Liberty Mutual's expert Mr. Welch testified that it took him about 27 hours to look at 500 sets of claim information to prepare his expert report. [Doc. 163-1, p. 3 (Welch Depo at p. 9)]. This averages out to approximately three minutes spent analyzing each file. This is not an unreasonable individual inquiry. *See Byrd v. Aaron's, Inc.*, 784 F.3d 154, 171 (3rd Cir. 2015) ("We are not alone in concluding that 'the size of a potential class and the need to review individual files to identify its members are not reasons to deny class certification.' To hold otherwise would seriously undermine the purpose of . . . Rule 23(b)(3)[.]"); *cf Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 778-79 (8th Cir. 2013) (holding that individual questions prevented predominance where individual inquiries were required regarding what is "usual and customary" and whether each claim payment was "reasonable").

Liberty Mutual's ongoing argument regarding the Lafollettes' decision to repair the damage to their home with the ACV payment also does not defeat predominance. As discussed above, a class member's decision to make repairs with their ACV payment is irrelevant to the issues before the Court.

For the above reasons, Rule 23(b)(3)'s predominance requirement is met.

### 2. Superiority

The final requirement of Rule 23(b)(3) is that the class action form be superior to other methods of adjudication, an analysis that "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen v. Carlisle &*

- 30 -

*Jacquelin,* 417 U.S. 156, 164 (1974). In determining whether superiority is met, a court considers:

> A.     the interest of members of the Class in individually controlling the prosecution of separate actions;
> B.     the extent and nature of any litigation concerning this controversy already commenced by potential Class members;
> C.     the desirability of concentrating the litigation of the claims in this particular forum; and
> D.     the difficulties likely to be encountered in the management of a class action.

Rule 23(b)(3). Liberty Mutual has not argued that superiority is lacking in this case and the Court concludes that the superiority requirement is satisfied.

With respect to the first factor, the Lafollettes are the only class members to have come forward seeking to act as lead plaintiff in a class action on behalf of Missouri insureds concerning this claim in the context of this specific base policy. Many thousands of insureds would have to bring claims individually if a class is not certified. Under the circumstances, and given the predominance of common questions, the alternatives to class litigation are more burdensome for individuals than participating in class litigation. Class action is the most efficient way to resolve the common questions of law and fact.

As for the second factor, there is no evidence of another case concerning these same claims, that a Missouri insured has already brought, or a Missouri insured could join.

The third factor, the desirability of concentrating the litigation of the claims in this particular forum, favors certification. The class members are Missourians, this division is centrally located in the state, and as noted above, no other litigation concerning this identical claim has been commenced elsewhere.

Last, the Court does not anticipate any significant or unusual difficulties in the management of this case as a class action. The Court has already addressed many of the substantive issues raised in the case through a summary judgment motion filed by Liberty Mutual. A Special Master has also been appointed to aid the parties in resolving any discovery disputes, and since the Special Master was appointed neither party has requested that the Court involve itself in any discovery issues. As discussed above, the designation of subclasses will enable the Court to consider divergent issues in a streamlined fashion.

Therefore, the class action device is the superior method for adjudicating the claims of the proposed class members identified above.

## III.  Plaintiffs' Motion to Strike

Following submission of the motion for class certification, the Lafollettes filed a motion to strike information pursuant to Rule 37(c)(1). The Lafollettes contend that Liberty Mutual improperly failed to limit their discovery responses to base policy HO 03 (Edition 04 91) as requested in Request For Production Number 28. The only remedy sought by the Lafollettes for Liberty Mutual's purported error is that Liberty Mutual's arguments and evidence that the Lafollettes inaccurately identified class members who had policy forms other than HO 03 (Edition 04 91) be stricken.

The Court will not strike Liberty Mutual's arguments or evidence for the reasons set forth *supra* at footnote 12. Most importantly, Liberty Mutual's argument does not prevent certification because the proposed class definition clearly limits members to those with the relevant base policy form and it is clear that those class members can be identified. Any error remedied by the motion to strike is therefore harmless.

- 32 -

The Lafollettes contend that Liberty Mutual's over-disclosure was not harmless because their experts have incurred extensive time and expense working with the data produced by Liberty Mutual. Though the parties will be permitted to submit revised final expert reports prior to the final determination of this case on the merits, these revisions will undoubtedly require the Lafollettes to incur expenses. However, the Court need not decide at this point whether Liberty Mutual's discovery responses were adequate, because the remedy the Lafollettes have requested will do nothing to mitigate the future expenses they will incur revising their expert reports. Even if the Court granted the motion to strike, the Lafollettes' expert reports would require revision and the Plaintiffs would incur the corresponding expense.

As Liberty Mutual's arguments related to the motion to strike have already been rejected by the Court on the merits and striking them would serve no useful purpose, the Lafollettes' motion to strike is denied.

## IV.    Conclusion

Plaintiffs' motion for class certification, Doc. 155, is granted and the class is defined as discussed above. Plaintiffs' motion to strike, Doc. 170, is denied.


/s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge


Dated: August 1, 2016
Jefferson City, Missouri

- 33 -