## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

| | | |
|---|---|---|
| ERIC LAFOLLETTE and CAMILLE LAFOLLETTE, individually and on behalf of others similarly situated, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 2:14-CV-04147-NKL |
| | ) | |
| LIBERTY MUTUAL FIRE INSURANCE COMPANY, | ) ) | |
| | ) | |
| Defendant. | ) | |

### ORDER

Pending before the Court are the cross motions for summary judgment of Plaintiffs Eric and Camille Lafollette and Defendant Liberty Mutual Fire Insurance Company. [Docs. 198 and 194]. As set forth below, Plaintiffs' and Defendant's motions are granted in part and denied in part.

### I. Undisputed Facts[1]

Plaintiffs Eric and Camille Lafollette purchased a LibertyGuard Deluxe Homeowners Insurance Policy, Form HO 00 03 (Edition 04 91), from Defendant Liberty Mutual Fire Insurance Company ("Liberty Mutual"). The Lafollettes' policy includes an endorsement for wind and hail damage. In January 2008, the Lafollettes' home was damaged by hail, and they sought payment from Liberty Mutual for that hail damage.

---

[1] Although the parties have denied their opponents' facts by trying to limit them to the inference or interpretation each prefers, some facts are clearly undisputed.

## A. Liberty Mutual's General Claims Handling Procedure

When a homeowner sustains damage to his or her property that is covered by a LibertyGuard Deluxe Homeowners Policy, the claim is handled and paid in two phases: (1) the actual cash value ("ACV") phase and (2) the replacement cost value ("RCV") phase. After the policyowner makes his or her claim, an adjustor goes to the location of the insured property to ascertain the damage. [Doc. 199-5, p. 141-45 (Depo. of Ricky Summerlin)]. The adjustor then uses a program called "Xactimate" to put a dollar figure on the amount of the damage. *Id.* The total amount of the loss is referred to as the "replacement cost." *Id.* at p. 145. After the total amount of the loss is calculated, the adjustor inputs factors for depreciation, and the amount of depreciation is subtracted from the replacement cost to give the ACV loss. *Id.* at 145-46.

Following this calculation, the policyowner is paid the ACV of the loss, minus the deductible.[2] No further payment on the claim is made unless the insured decides to repair or replace the damage to the property. *Id.* at p. 155-56. The insured is not required to undertake this repair. *Id.* at p. 148-50. Nor is the insured required to come back and submit a replacement cost claim for payment of the withheld depreciation. *Id.* at p. 150-51. Instead, the insured may take the ACV payment in satisfaction of their claim to do with whatever he or she chooses. *Id.* at p. 148-50. To recover the RCV, the insured must repair or replace the damage and submit proof of the repairs to Liberty Mutual. *Id.* at p. 155-56.

## B. The Lafollettes' Claim

In January 2008, the Lafollettes' home sustained hail damage, and they submitted a claim for coverage. This claim constituted a loss that was covered under the terms of the policy. Liberty Mutual estimated the ACV of the loss and paid the Lafollettes the ACV minus a $1000

---

[2] The propriety of the assessment of this deductible is what is disputed in this lawsuit.

deductible. On April 8, 2014, the Lafollettes filed a putative class action against Liberty Mutual alleging that Liberty Mutual unlawfully applied a deductible to the ACV payment for their hail damage claim.

On October 19, 2015, the Court denied Liberty Mutual's motion for summary judgment. [Doc. 115]. On August 1, 2016, the Court certified a Rule 23(b)(3) class and four subclasses. [Doc. 177]. The Court appointed the Lafollettes as representatives of the plaintiff class, which is defined as:

> All persons who received an ACV payment, directly or indirectly, from Liberty Mutual Fire Insurance Company for physical loss or damage to their dwelling or other structures located in the state of Missouri arising under policy Form HO 03 (Edition 04 91) and endorsements, such payments arising from losses that occurred from April 8, 2004 to August 1, 2016, where a deductible was applied to the ACV payment for the person's dwelling or other structure (Coverage A and/or B).
>
> Excluded from the Class are: (1) All persons who submitted a claim for and received a replacement cost payment from Liberty Mutual Fire Insurance Company under Coverage A and/or B; (2) All persons whose payment(s) plus the amount of any deductible applied was less than $2,500; (3) All persons whose claim(s) were caused by earthquake; (4) Liberty Mutual Fire Insurance Company and its affiliates, officers, and directors; (5) Members of the judiciary and their staff to whom this action is assigned; and (6) Plaintiffs' Counsel.

There are three certified subclasses, defined as:

(1) All parties who received an ACV payment for loss arising solely under the base policy and/or Home Protector Plus Endorsement;
(2) All parties who received an ACV payment for loss arising under the Wind/Hail Endorsement; and
(3) All parties who received an ACV payment for loss arising under the Functional Replacement Cost Loss Settlement Endorsement.[3]

---

[3] The stated class definition and subclasses reflect the Court's amendments to the definition following its decertification of the Earthquake Endorsement Subclass. *See* [Doc. 227 (Order granting Plaintiff's unopposed motion to decertify)].

3

### C. Deductible Information for Purposes of Damages

Liberty Mutual's manager of business systems, Jeffrey Gabriel, testified that Defendant could determine the amount of a deductible applied to a claim. [Doc. 215, p. 18; Doc. 199-8, p. 137 and 180-81]. Liberty Mutual has produced two spreadsheets containing data identifying the amount of deductible withheld from each class member's property claims. The spreadsheets identify each potential class member's claim, and in the column marked "Unique Deductible amount from Trans Detail," the spreadsheets identify the amount of deductible withheld from each claim. [Doc. 215, p. 18; Doc. 199-6 and 199-7 (Spreadsheets)].

### D. Class Members' Policies

The class members' policies contain three relevant sections: the Declarations, the base policy language, and the endorsements. These sections work together to define the parameters of their coverage. The Declarations set out the limits on recovery under the policy, list the endorsements included in the policy, and note the deductibles that may be assessed under the policy. The base policy language contains the standard terms of the policy. The endorsements are additions to the policy which customize the coverage and terms of the base policy language to create the specific coverage purchased by the policyowner. The terms of the endorsements control over conflicting provisions in the base policy language or Declarations. *Grable v. Atlantic Cas. Ins. Co.*, 280 S.W.3d 104, 108 (Mo. Ct. App. 2009).

#### 1. The Base Policy

The Lafollettes' and class members' base policy form HO 00 03 (Edition 04 91) includes, among others, the following: Section I – Property Coverages; Section I – Perils Insured Against; Section I – Exclusions; and Section I – Conditions. The base policy's coverage provision states:

Case 2:14-cv-04147-NKL   Document 232   Filed 03/16/17   Page 4 of 39

**COVERAGE A – Dwelling**
We cover:
1.  The dwelling on the "residence premises" shown in the Declarations, including structures attached to the dwelling; and
2.  Materials and supplies located on or next to the "residence premises" used to construct, alter or repair the dwelling or other structures on the "residence premises."
This coverage does not apply to land, including land on which the dwelling is located.

**COVERAGE B – Other Structures**
We cover other structures on the "residence premises" set apart from the dwelling by clear space.  This includes structures connected to the dwelling by only a fence, utility line, or similar connections.
. . .
The limit of liability for this coverage will not be more than 10% of the limit of liability that applies to Coverage A.  Use of this coverage does not reduce the Coverage A limit of liability.

**COVERAGE C – Personal Property**
We cover personal property owned or used by an "insured" while it is anywhere in the world.
. . .
**Special Limits of Liability.**  These limits do not increase the Coverage C limit of liability. . . .
. . .

**COVERAGE D – Loss of Use**
The limit of liability for Coverage D is the total limit for all the coverages that follow.
1.  If a loss covered under this Section makes that part of the "residence premises" where you reside not fit to live in, we cover, at your choice, either of the following.  However, if the "residence premises" is not your principal place of residence, we will not provide the option under paragraph b. below.
    a.  **Additional Living Expense,** meaning any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living; or
    b.  **Fair Rental Value,** meaning the fair rental value of that part of the "residence premises" where you reside less any expenses that do not continue while the premises is not fit to live in.
    Payment under a. or b. will be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere.
. . .

**ADDITIONAL COVERAGES**
. . .

5

**4. Fire Department Service Charge**. We will pay up to $500 for your liability assumed by contract or agreement for fire department charges incurred when the fire department is called to save or protect covered property from a Peril Insured Against. . . .
This coverage is additional insurance. No deductible applies to this coverage.
. . .

The base policy's loss settlement provisions for Coverages A, B, and C are included

within Section I – Conditions, as follows:

| SECTION I – CONDITIONS |
| --- |

. . .

**3.  Loss Settlement.**    Covered property losses are settled as follows:

    a.  Property of the following types:

        (1)  Personal property;

        (2) Awnings, carpeting, household appliances, outdoor antennas and outdoor equipment, whether or not attached to buildings; and

        (3)  Structures that are not buildings;

        at actual cash value at the time of loss but not more than the amount required to repair or replace.

    b.  Buildings under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:

        (1) If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:

            (a) The limit of liability under this policy that applies to the building;

            (b)  The replacement cost of that part of the building damaged for like construction and use on the same premises; or

            (c)  The necessary amount actually spent to repair or replace the damaged building.

        (2)  If, at the time of loss, the amount of insurance in this policy on the damaged building is less than 80% of the full replacement cost of the building immediately before the loss, we will pay the greater of the following amounts, but not more than the limit of liability under this policy that applies to the building:

            (a) The actual cash value of that part of the building damaged; or

            (b) That proportion of the cost to repair or replace,

6

after application of deductible and without deduction for depreciation, that part of the building damaged, which the total amount of insurance in this policy on the damaged building bears to 80% of the replacement cost of the building.

. . .

(4) We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss according to the provisions of b.(1) and b.(2) above.

. . .

(5) You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis. You may then make claim within 180 days after loss for any additional liability according to the provisions of this Condition 3. Loss Settlement.

[Doc. 214-1, p. 6-15 (Lafollette Policy, Bates LMFIC000066-75)].

### 2. The Endorsements

The Lafollettes' and some class members' insurance policies include a Home Protector Plus Endorsement. If certain conditions are met,[4] the Home Protector Plus Endorsement has a slightly different loss settlement provision, as follows:

**HOMEPROTECTOR PLUS ENDORSEMENT**

. . .

**B.      REPLACEMENT COST PROVISION – DWELLING AND PERSONAL PROPERTY**

. . .

3. Loss Settlement. Covered property losses are settled as follows:

a. The applicable limit of liability for Buildings under Coverage A or B is the replacement cost, after application of deductible and without deduction for depreciation, subject to the following:

(1)  We will pay the cost of repair or replacement, but not exceeding:

(a) The replacement cost of the part of the building damaged using like construction on the same premises and intended for the same occupancy and use;

_____

[4] Both parties agree that these conditions have been met, and therefore, they are not relevant to the analysis.

7

      (b) With respect to Coverage A, an amount not exceeding 20% greater than the limit of liability stated in the declarations, as modified by the Inflation Protection Provision of the policy;

      (c) With respect to Coverage B, the limit of liability stated in the declarations, as modified by the Inflation Protection Provision of the policy;

      (d) The amount actually and necessarily spent to repair or replace the damage.

   (2) We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss according to the provisions of a.(1) above.

. . .

c. Personal property, carpeting and domestic appliances: at replacement cost but not exceeding the amount needed to repair or replace subject to the following:

   (1) Our limit of liability for loss to Personal Property shall not exceed the smallest of the following:

      (a) Replacement cost with a similar item of like kind and quality at the time of loss;

      (b) The full cost of repair;

      (c) Any special limit of liability described in the policy or stated in this endorsement; or

      (d) The Coverage C limit of liability stated in the declarations, as modified by the Inflation Protection Provision of the policy.

   (2) This endorsement shall not apply to:

      (a) Fine arts and items which, by their nature cannot be replaced with new items.

      (b) Articles whose age or history contribute substantially to their value including souvenirs or collector's items.

      (c) Property that is unusable for the purope for which it was originally intended due to age or historic condition.

   (3) We will not pay for any loss to personal property under this endorsement until actual repair or replacement is complete.

d. You may disregard the replacement cost provision and make a claim for loss of or damage to property on an actual cash value basis and then make claim within 180 days after loss for additional liability under this endorsement.

. . .

**D.    ADDITIONAL COVERAGES**

Lock Replacement Coverage

We will pay up to $250 for replacing the locks or cylinders on the exterior doors of the residence premises when your keys have been stolen. The theft of the keys must be reported to the police for this coverage to apply.

This coverage is additional insurance. No deductible applies to this coverage.

[Doc. 214-1, p. 23-24 (Lafollette Policy), Bates LMFIC000083-84].

The Lafollettes' and some class members' insurance policies also contain a Windstorm or

Hail Deductible Endorsement ("Wind/Hail Endorsement"), which states:

### WINDSTORM OR HAIL DEDUCTIBLE

The following special deductible is added to the policy:

With respect to the peril of Windstorm Or Hail, we will pay only that part of the total of all loss payable under Section I that exceeds the windstorm or hail deductible.

The dollar or percentage amount of the windstorm or hail deductible is shown on the policy declaration.
. . .
No other deductible in the policy applies to loss caused by windstorm or hail.

[Doc. 214-1, p. 34 (Lafollette Policy), Bates LMFIC000094].

Finally, some class members' policies contain a Functional Replacement Cost Loss

Settlement Endorsement ("FRCE"). This endorsement also contains its own loss settlement

provision, which provides:

**FUNCTIONAL REPLACEMENT COST LOSS SETTLEMENT**
. . .
**SECTION I – CONDITIONS**
The following definition is added when this endorsement is attached to the policy:
**Functional Replacement Cost** means the amount which it would cost to repair or replace the damaged building with less costly common construction materials and methods which are functionally equivalent to obsolete, antique or custom construction materials used in the original construction of the building.
. . .
For the premium charges, item **3.b. Loss Settlement** is deleted and replaced by the following:
 b. Buildings under Coverage A or B:
　　　(1) If, at the time of loss,
　　　　　(a) The amount of insurance in this policy on the damaged
　　　　　　　 building is 80% or more of the functional replacement cost of

9

the building immediately before the loss; and

    (b)  You contract for repair or replacement of the damaged building for the same use, within 180 days of the damage unless we and you otherwise agree;

we will pay, after application of deductible, the lesser of the following amounts:

    (a)  The limit of liability under this policy that applies to the building; or

    (b)  The necessary amount actually spent to repair or replace the damaged building on a functional replacement cost basis.

(2) If you do not make claim under Paragraph (1) above, we will pay, after application of deductible, the least of the following amounts:

    (a)  The limit of liability under this policy that applies to the building;

    (b)  The actual cash value of the damaged part of the building; or

    (c)  The amount which it would cost to repair or replace the damaged building on a functional replacement cost basis.

(3) If, at the time of loss, the amount of insurance in this policy on the damaged building is less than 80% of the functional replacement cost of the building immediately before the loss, we will pay that proportion of the cost to repair or replace that part of the building damaged:

    (a) After application of deductible; and

    (b) Without deduction for depreciation:

which the total amount of insurance in this policy on the damaged building bears to 80% of the functional replacement cost of the building, but not more than the limit of liability under this policy that applies to the building.

. . .

(5) If the actual cash value of the damage is less than the functional replacement cost:

    (a)  We will pay no more than the actual cash value of the damage until replacement is complete.  Once replacement is complete, we will settle the loss according to the provisions b.(1) and b.(3) above.

        However, if the cost to functionally repair the damage is both:

        (i)  Less than 5% of the amount of insurance in this policy on the building; and

        (ii)  Less than $2,500;

        we will settle the loss according to the provisions of b.(1) and b.(3) above whether or not replacement is complete.

    (b)  You may disregard the functional replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis.

You may then make claim for any additional liability according to the provisions of this Condition 3. Loss Settlement, provided we are notified of your intent to do so within 180 days of the date of

10

loss.

[Doc. 199-4, p. 2-3 (FRCE Endorsement), Bates LMFIC031162)].

### 3. The Declarations

The first two pages of the Lafollettes' policy contain the "Declarations." In relevant part, the Declarations provide:

> SECTION I AND II: COVERAGES AND LIMITS UNDER YOUR LIBERTYGUARD HOMEOWNERS POLICY
>
> I: COVERAGE A – YOUR DWELLING WITH EXPANDED REPLACEMENT COST  $158,300
> COVERAGE B – OTHER STRUCTURES ON RESIDENCE PREMISES $15,830
> COVERAGE C – PERSONAL PROPERTY WITH REPLACEMENT COST  $118,725
> COVERAGE D – LOSS OF USE OF YOUR RESIDENCE PREMISES ACTUAL LOSS SUSTAINED
>
> II: COVERAGE E – PERSONAL LIABILITY (EACH OCCURRENCE) $300,000
> COVERAGE F – MEDICAL PAYMENTS TO OTHERS (EACH PERSON)  $1,000
>
> DEDUCTIBLE: LOSSES COVERED UNDER SECTION I ARE SUBJECT TO A DEDUCTIBLE OF $1000
>
> OTHER DEDUCTIBLES: $1000 WINDSTORM OR HAIL

[Doc. 214-1, p. 2-3 (Declarations), Bates LMFIC000062-63].

## II.    Discussion

The primary issue in this lawsuit is whether Liberty Mutual's policy permits it to subtract a deductible from an Actual Cash Value payment made for an insured's property damage covered under the base policy, Home Protector Plus Endorsement, Wind/Hail Endorsement, and/or Functional Cost Replacement Loss Settlement Endorsement. Plaintiffs' Liberty Mutual policy provides several different types of property "coverages," including Coverage A –

11

Dwelling; Coverage B – Other Structures; Coverage C – Personal Property; Coverage D – Loss of Use; and Additional Coverage. The dispute in this lawsuit is whether a deductible should be applied to a claim under Coverage A and/or B, regardless of whether the insured opts for an actual cash value ("ACV") payment or a replacement cost value ("RCV") payment. As already discussed, Coverage A and B claims are paid out in two phases: (1) the ACV phase and (2) the RCV phase. After the ACV payment is made to the insured, the claim is complete, and Liberty Mutual does not provide any additional payment unless the insured decides to repair or replace the damage to the property and submits proof to Liberty Mutual.

Liberty Mutual moves for summary judgment for a second time and again argues that its policy requires the payment of a deductible, regardless of whether the insured opts for an ACV or RCV payment for Coverage A and/or B losses covered by the policy. In doing so, Liberty Mutual includes new arguments, as well as arguments it already briefed in its previous motion for summary judgment, "inviting the Court to reconsider its earlier denial." [Doc. 195, p. 13].

Plaintiffs move for summary judgment because they interpret Liberty Mutual's base policy and relevant endorsements as allowing a deductible to be taken only when an RCV payment is made to the insured. Plaintiffs move for judgment on the issues of liability and damage, requesting that the Court set forth the means for determining each class member's damages.

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). In this case, there is no dispute of material fact. Therefore, the only question is whether Liberty Mutual's policy requires a deductible to be paid when an ACV payment is made for Coverage A and B claims, and if so, how class damages are

12

to be determined. This question requires the Court to determine whether a deductible must be applied to an ACV payment for Coverage A and B claims made under the base policy, Home Protector Plus Endorsement, Wind/Hail Endorsement, and/or Functional Replacement Cost Loss Settlement Endorsement.

### A. Interpretation of Insurance Contracts in Missouri

The interpretation of an insurance policy is a question of law to be determined by the Court. *Mendota Ins. Co. v. Lawson*, 456 S.W.3d 898, 903 (Mo. Ct. App. 2015). Missouri courts read insurance contracts "as a whole and determine the intent of the parties, giving effect to that intent by enforcing the contract as written." *Thiemann v. Columbia Pub. Sch. Dist.*, 338 S.W.3d 835, 840 (Mo. Ct. App. 2011). To determine the intent of the parties, the language in the contract is to be read according to its plain and ordinary meaning. *Mendota*, 456 S.W.3d at 903. If an ambiguity exists the policy language will be construed against the insurer. *Id.* at 904. "'An ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of the language of the policy.'" *Fanning v. Progressive Northwestern Ins. Co.*, 412 S.W.3d 360, 364 (Mo. Ct. App. 2013) (quoting *Seeck v. Geico Gen. Ins. Co.*, 212 S.W.3d 129, 132 (Mo. banc 2007)). "'To test whether the language used in the policy is ambiguous, the language is considered in the light in which it would normally be understood by the lay person who bought and paid for the policy.'" *Blumer*, 340 S.W.3d at 219 (quoting *Heringer v. Am. Family Mut. Ins. Co.*, 140 S.W.3d 100, 102 (Mo. Ct. App. 2004)).

As previously explained, an insurance policy consists of the policy, the declarations, and any endorsements and definitions. *Grable v. Atlantic Cas. Ins. Co.*, 280 S.W.3d 104, 107-08 (Mo. Ct. App. 2009). "The terms and conditions of the policy are modified and altered to the extent called for by the endorsement. . . . If the language of the endorsement and the general

13

provisions of the policy conflict, the endorsement will prevail, and the policy remains in effect as altered by the endorsement." *Id.* at 108 (quotation omitted).

### B. Standing

First, the Court rejects Liberty Mutual's preliminary argument that the Lafollettes lack standing. In order to bring a class action, the Lafollettes must have suffered an "injury in fact." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The injury must be both concrete and particularized, meaning it must actually exist and "must affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 2016 WL 2842447, at *6-7 (S. Ct. May 16, 2016).

With some slight modifications, Liberty Mutual's standing arguments are generally the same as those already rejected by the Court in its class certification Order. *See* [Doc. 177, p. 6-8]. Liberty Mutual argues the Lafollettes lack standing because they received the "limit of liability" under their policy, and thus, they did not suffer any injury. Liberty Mutual points to the provision in the Home Protector Plus Endorsement, which provides, "The applicable limit of liability for Buildings under Coverage A or B is the replacement cost, after application of deductible and without deduction for depreciation." [Doc. 214, p. 23-24 (Lafollette Policy), Section B.3.a.]. According to Liberty Mutual, because the Lafollettes could have replaced their loss for an amount less than the ACV they received and because Liberty Mutual is entitled to apply a deductible to RCV payments, the Lafollettes were not injured by Liberty Mutual's taking a deductible at the ACV stage because their ACV payment was sufficient to replace their damaged property. In other words, Liberty Mutual contends it overestimated the Lafollettes' ACV payment because they actually repaired their damage for an amount that was less than the ACV they received, and the maximum amount they were entitled to under the policy was the amount actually and necessarily spent to repair the damage.

14

Liberty Mutual's standing argument fails because its own policy language and the process it uses for paying RCV and ACV claims reveal that these two types of payments are different. This Court has already recognized the distinction between the RCV and ACV provisions of the policy, and the same logic applies here. *See* [Doc. 177, p. 7-8 (Order granting class certification)]. Liberty Mutual's construction of the policy assumes that policyholders were obligated to seek an RCV payment upon actually repairing or replacing damage to their home and that the limitations applicable to the RCV payment are equally applicable to an ACV payment. However, this obligation is explicitly disclaimed in the policy, which notes,

> d. You may disregard the replacement cost loss settlement provisions and make a claim under this policy for loss or damage to buildings on an actual cash value basis. You *may* then make claim within 180 days after the loss for any additional liability according to the provisions of this Condition 3 Loss Settlement.

[Doc. 214-1, p. 23-24 (Lafollette Policy), Section B.3.d., Bates LMFIC000083-84 (emphasis added)]. Under this provision, it is the choice of the *policyholder* whether to pursue an ACV or RCV payment. Nothing in this provision requires a policyholder to make a claim for RCV payment at any point in the process. [*See* Doc. 199-5, p. 150-51 (Depo. of Ricky Summerlin)]. Further, the ACV payment is not transformed into an RCV payment simply because the policyholder chooses to use her ACV payment to repair damage to her home, much less because the ACV payment was sufficient to cover the cost of repairs. If the policyholder chose not to seek the RCV payment under these circumstances, as the policy permitted her to do, the ACV payment is not effectively transformed into an RCV payment and subject to limitations only applicable to RCV payments. *See also Tritschler v. Allstate Ins. Co.*, 144 P.3d 519, 529 (Ariz. Ct. App. 2006) ("[T]he determination of actual cash value is not based upon what the insured actually pays to repair or replace the damaged property. Therefore, the amount an insured ultimately spends to make needed repairs, *if any*, is irrelevant.").

Accordingly, because the Lafollettes did not seek payment under the policy's replacement cost provisions, these provisions with their applicable limits of liability do not apply. The amount the Lafollettes actually spent to repair the damage is wholly irrelevant to whether they were injured. This is because, as already discussed, the ACV payment belongs to the insured, does not have to be used for repairs, and is not tied to repair costs.

In an extension of this standing argument, Liberty Mutual also contends that the Lafollettes cannot establish damages because their ACV payment was allegedly sufficient to cover their repairs. As discussed above, Liberty Mutual's argument relies on a payment limitation that relates only to payments made under the RCV provisions of the policy, and ACV payments do not implicate the RCV provisions Liberty Mutual attempts to apply.

### C. The Base Policy & Home Protector Plus Endorsement

Liberty Mutual's Policy Form HO 03 (Edition 04 91) contains various loss settlement provisions dictating the process by which claims are paid. The base policy contains a loss settlement provision, which can be modified by three relevant endorsements that offer their own loss settlement provisions: the Home Protector Plus Endorsement, the Wind/Hail Endorsement, and the Functional Replacement Cost Loss Settlement Endorsement.

As previously described, the base policy contains the following loss settlement provision, which dictates how RCV and ACV claims will be paid under the policy:

| SECTION I – CONDITIONS |
| --- |

. . .
  **3.**    **Loss Settlement.**      Covered property losses are settled as follows:
           a.   Property of the following types:
                 (1)  Personal property;
                 (2) Awnings, carpeting, household appliances, outdoor antennas and outdoor equipment, whether or not attached to buildings; and
                 (3)  Structures that are not buildings;
                 at actual cash value at the time of loss but not more than the

amount required to repair or replace

b. Buildings under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:

(1) If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:

(a) The limit of liability under this policy that applies to the building;

(b) The replacement cost of that part of the building damaged for like construction and use on the same premises; or

(c) The necessary amount actually spent to repair or replace the damaged building.

(2) If, at the time of loss, the amount of insurance in this policy on the damaged building is less than 80% of the full replacement cost of the building immediately before the loss, we will pay the greater of the following amounts, but not more than the limit of liability under this policy that applies to the building:

(a) The actual cash value of that part of the building damaged; or

(b) That proportion of the cost to repair or replace, after application of deductible and without deduction for depreciation, that part of the building damaged, which the total amount of insurance in this policy on the damaged building bears to 80% of the replacement cost of the building.

. . .

(4) We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss according to the provisions of b.(1) and b.(2) above.

. . .

(5) You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis. You may then make claim within 180 days after loss for any additional liability according to the provisions of this Condition 3. Loss Settlement.

17

[Doc. 214-1, p. 13-15 (Lafollette Policy, Bates LMFIC000073-75)].

The Home Protector Plus Endorsement contains its own loss settlement provision, which the parties agree is the controlling loss settlement provision when it is added to the base policy and certain conditions are met.[5]  The loss settlement provision in the base policy is substantially the same as that in the Home Protector Plus Endorsement, and as discussed below, it results in the same interpretation.   The Home Protector Plus Endorsement loss settlement provision provides:

**HOMEPROTECTOR PLUS ENDORSEMENT**
. . .
**B.   REPLACEMENT COST PROVISION – DWELLING AND PERSONAL PROPERTY**
. . .
3.  Loss Settlement.  Covered property losses are settled as follows:
a. The applicable limit of liability for Buildings under Coverage A or B is the replacement cost, after application of deductible and without deduction for depreciation, subject to the following:
(1) We will pay the cost of repair or replacement, but not exceeding:
(a) The replacement cost of the part of the building damaged using like construction on the same premises and intended for the same occupancy and use;
(b) With respect to Coverage A, an amount not exceeding 20% greater than the limit of liability stated in the declarations, as modified by the Inflation Protection Provision of the policy;
(c) With respect to Coverage B, the limit of liability stated in the declarations, as modified by the Inflation Protection Provision of the policy;
(d) The amount actually and necessarily spent to repair or replace the damage.
(2)  We will pay no more than the actual cash value of the damage until actual repair or replacement is complete.   Once actual

---

[5] For the Home Protector Plus Endorsement loss settlement provision to replace the base policy provision, the insured must meet the following Section 1 Condition:

17.  Additions or Changes to Dwelling – Notice to Company.  You must inform us within 90 days of the start of any additions, alterations or improvements to the dwelling that will increase the replacement cost of the dwelling by $5000 or more.
[Doc. 214-1, p. 23 (Lafollette Policy, Bates LMFIC 000083)].

18

repair or replacement is complete, we will settle the loss according to the provisions of a.(1) above.

. . .

c. Personal property, carpeting and domestic appliances: at replacement cost but not exceeding the amount needed to repair or replace subject to the following:

(1) Our limit of liability for loss to Personal Property shall not exceed the smallest of the following:

(a) Replacement cost with a similar item of like kind and quality at the time of loss;

(b) The full cost of repair;

(c) Any special limit of liability described in the policy or stated in this endorsement; or

(d) The Coverage C limit of liability stated in the declarations, as modified by the Inflation Protection Provision of the policy.

. . .

(3) We will not pay for any loss to personal property under this endorsement until actual repair or replacement is complete.

d. You may disregard the replacement cost provision and make a claim for loss of or damage to property on an actual cash value basis and then make claim within 180 days after loss for additional liability under this endorsement.

[Doc. 214-1, p. 23-24 (Lafollette Policy), Bates LMFIC000083-84].

Plaintiffs contend that the base policy and the Home Protector Plus Endorsement both preclude application of a deductible to ACV payments for Coverage A and B claims. In its previous Order, the Court already considered these arguments and interpreted the Home Protector Plus Endorsement as follows.[6] First, the endorsement's loss settlement provision contains separate provisions for RCV and ACV losses. For RCV payments, the endorsement provides that "[t]he applicable limit of liability . . . is the replacement cost, *after application of deductible and without deduction for depreciation . . . .*" Section B.3.a. (emphasis added). Section B.3.d. of the endorsement's loss settlement provision provides:

---

[6] For the same analysis in the Court's previous Order denying Liberty Mutual's first motion for summary judgment, *see* [Doc. 115, p. 7-8].

19

> d. You may disregard the replacement cost provision [i.e. Section B.3.a.] and make a claim for loss of or damage to property on an actual cash value basis and then make claim within 180 days after loss for additional liability under this endorsement.

Thus, the insured who is willing to accept the ACV can disregard the "replacement cost provision," which is the only section in the loss settlement provision that mentions a deductible.

Although the loss settlement language of the Home Protector Plus Endorsement replaces the loss settlement language of the base policy in cases in which it applies, these provisions are functionally identical. Both provisions state that the RCV will be paid "after application of deductible and without deduction for depreciation." They go on to state, "We will pay no more than the actual cash value of the damage until actual repair or replacement is complete." Finally, they state, "You may disregard the [RCV] provision[] and make [a] claim [] for loss [] or damage[s] to [property] on an actual cash value basis [and] then make claim within 180 days after loss for [] additional liability . . . ."

Just as in the Home Protector Plus Endorsement, the base policy's loss settlement provision contains separate provisions for RCV and ACV losses. For RCV payments, the base policy provides, "If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, *after application of deductible and without deduction for depreciation* . . ." Section I – Conditions, 3.b.(1). Section I – Conditions, 3.b.(5) states:

> (5) You may disregard the replacement cost loss settlement provisions [i.e. Section I – Conditions, 3.b.(1)] and make claim under this policy for loss or damage to buildings on an actual cash value basis. You may then make claim within 180 days after loss for any additional liability according to the provisions of this Condition 3. Loss Settlement.

Thus, just as under the Home Protector Plus Endorsement, the insured who is willing to accept the ACV payment under the base policy can disregard the "replacement cost loss

20

settlement provisions," which are the only sections in the loss settlement provision that mention a deductible.

The general rule of contract interpretation, *expressio unius est exclusio alterius,* is instructive here. Both the Home Protector Plus Endorsement and base policy's respective loss settlement provisions are silent regarding an ACV deductible in the face of their explicit references to an RCV deductible. This silence suggests the parties did not intend to make the deductible applicable to ACV payments. *See Smith v. Missouri Local Gov. Employees Retirement System*, 235 S.W.3d 578, 582 (Mo. Ct. App. 2007). Therefore, if, like Plaintiffs, an insured accepts an ACV payment under Section B.3.d of the Home Protector Plus Endorsement or Section I – Conditions, 3.b.(5) of the base policy, and the insured does not submit a replacement cost claim, Section B.3.a. of the endorsement (or Section I – Conditions, 3.b.(1). of the base policy) is not implicated. As discussed above, this language establishes that Liberty will not apply a deductible when making ACV payments under the endorsement's Section B.3.d. or the base policy's Section I – Conditions, 3.b.(5).

Liberty Mutual, however, contends that this construction of the language in Section B.3.a. for dwelling and other structures claims (Coverages A and B) conflicts with the Home Protector Plus Endorsement's language in Section B.3.c. regarding personal property claims (Coverage C).[7] Liberty argues that this interpretation is unreasonable because it ignores Section B.3.c., which concerns settling a personal property loss at replacement cost and does not reference a deductible. In relevant part, Section B.3.c. provides:

---

[7] Liberty Mutual notes that its arguments about the Home Protector Plus Endorsement apply equally to the base policy language. [Doc. 215, p. 31, n. 6]. Because Liberty Mutual presents its arguments with respect to the Home Protector Plus Endorsement provisions, the Court addresses its arguments in the same way, recognizing that the same analysis applies to the base policy language, unless otherwise indicated.

21

<u>**HOMEPROTECTOR PLUS ENDORSEMENT**</u>

. . .

**B.      REPLACEMENT COST PROVISION – DWELLING AND PERSONAL PROPERTY**

. . .

3.  Loss Settlement.  Covered property losses are settled as follows:

. . .

c.  Personal property, carpeting and domestic appliances: at replacement cost but not exceeding the amount needed to repair or replace subject to the following:

(1)  Our limit of liability for loss to Personal Property shall not exceed the smallest of the following:

(a)  Replacement cost with a similar item of like kind and quality at the time of loss;

(b)  The full cost of repair;

(c)  Any special limit of liability described in the policy or stated in this endorsement; or

(d)  The Coverage C limit of liability stated in the declarations, as modified by the Inflation Protection Provision of the policy.

. . .

(3) We will not pay for any loss to personal property under this endorsement until actual repair or replacement is complete.

d.  You may disregard the replacement cost provision and make a claim for loss of or damage to property on an actual cash value basis and then make claim within 180 days after loss for additional liability under this endorsement.

[Doc. 214-1, p. 23-24 (Lafollette Policy), Bates LMFIC000083-84].   According to Liberty Mutual, the Court's interpretation applied to Section B.3.c. would mean that a deductible is never applied to personal property loss claims, despite this provision's reference to settling replacement cost, which is "a loss settlement method the Court has concluded *does* encompass a deductible."  [Doc. 195, p. 22].  Therefore, Liberty Mutual contends, the Court's interpretation presents a conflict within the endorsement.

Liberty Mutual's argument is not persuasive because Section B.3.d.'s provision does not apply to Section B.3.c., and thus, there is no conflict.  Liberty Mutual attacks the Court's interpretation of Section B.3.a., which applies to Coverages A and B, and which the Court

22

interpreted in conjunction with Section B.3.d., which states, "You may disregard the replacement cost provision and make a claim for loss of or damage to property on an actual cash value basis and then make claim within 180 days after loss for additional liability under this endorsement." Unlike Section B.3.a., Section B.3.c.(3) for Coverage C personal property claims does not provide for ACV payments and specifically dictates that no payment will be made "for any loss to personal property under this endorsement *until actual repair or replacement is complete*." Section B.3.c.(3) (emphasis added). Therefore, the ACV provision in Section B.3.d. cannot be read to apply to Coverage C personal property claims under B.3.c., which may only be paid out *after* actual repair or replacement is completed. Accordingly, Liberty Mutual's arguments about Section B.3.c. are irrelevant to Section B.3.d.'s interpretation.

Liberty Mutual also identifies two other portions of the policy as relevant and posing alleged conflicts with the Court's interpretation: (1) the base policy's "Fire Department Service Charge" section and (2) the Home Protector Plus Endorsement's "Lock Replacement Coverage" section. Located within Section I – Property Coverages, the base policy's "Fire Department Service Charge" section provides:

| SECTION I – PROPERTY COVERAGES |
|---|

**COVERAGE A – Dwelling**
. . .
**COVERAGE B – Other Structures**
. . .
**COVERAGE C – Personal Property**
• . .
**COVERAGE D – Loss of Use**
. . .
**ADDITIONAL COVERAGES**
. . .
**4. Fire Department Service Charge**. We will pay up to $500 for your liability assumed by contract or agreement for fire department charges incurred when the fire department is called to save or protect covered property from a Peril Insured Against. . . .
*This coverage is additional insurance. No deductible applies to this coverage.*

23

. . .

[Doc. 214-1, p. 6-9 (Lafollette Policy, Bates LMFIC000066-69) (emphasis added)].  Located in

Section D – Additional Coverages, the Home Protector Plus Endorsement's "Lock Replacement

Coverage" section provides:

> **HOMEPROTECTOR PLUS ENDORSEMENT**
> . . .
> **B.    REPLACEMENT COST PROVISION – DWELLING AND PERSONAL PROPERTY**
> 
> . . .
> 3.  Loss Settlement.  Covered property losses are settled as follows:
> a. The applicable limit of liability for Buildings under Coverage A or B is the replacement cost, after application of deductible and without deduction for depreciation, subject to the following:
> 
> > . . .
> > c.  Personal property, carpeting and domestic appliances: at replacement cost but not exceeding the amount needed to repair or replace subject to the following:
> > 
> > . . .
> > d.  You may disregard the replacement cost provision and make a claim for loss of or damage to property on an actual cash value basis and then make claim within 180 days after loss for additional liability under this endorsement.
> 
> . . .
> **D.    ADDITIONAL COVERAGES**
> Lock Replacement Coverage
> We will pay up to $250 for replacing the locks or cylinders on the exterior doors of the residence premises when your keys have been stolen.  The theft of the keys must be reported to the police for this coverage to apply.  *This coverage is additional insurance.   No deductible applies to this coverage.*

[Doc. 214-1, p. 23-24 (Lafollette Policy), Bates LMFIC000083-84 (emphasis added)].  Liberty

Mutual points to the inclusion of the phrase, "No deductible applies to this coverage," within

both the "Fire Department Service Charge" and "Lock Replacement Coverage" sections.   [Doc.

214-1, p. 9 and p. 24].  Liberty Mutual contends that this phrase's absence elsewhere in the

policy must mean that a deductible does apply to ACV claims, in contrast to the Court's

interpretation.

24

The Court rejects this argument because policy language related to lock replacement and fire department service charges, both of which fall under "Additional Coverages" sections, do not impact the loss settlement provisions of the policy related to ACV payments for Coverage A and B claims. Furthermore, Liberty Mutual does not include the language preceding the "no deductible applies" phrase, which states, "This coverage is additional insurance." *Id.* The fact that Liberty Mutual decided to include these *additional* insurance coverages and not charge a deductible does not change the fact that the policy's loss settlement provisions for Coverage A and B claims (in the endorsement's Section b.3.a. and the base policy's Section I – Conditions, 3.b.) do not allow a deductible to be subtracted from ACV payments. The "conflicting" provisions identified by Liberty Mutual apply to a type of coverage independent from coverage for A and B claims—coverage that falls under the "Additional Coverages" type of claims. As evidenced by the policy language, these "Additional Coverages" claims are settled differently than Coverage A and B claims and have their own requirements and limits, e.g., "up to $250 for replacing the locks or cylinders on the exterior doors of the residence premises when your keys have been stolen. The theft of the keys must be reported to the police for this coverage to apply." Section D., "Lock Replacement Coverage."

As a separate argument, Liberty Mutual cites this Court's decision in *Labrier v. State Farm and Casualty Co.*, 2015 WL 7738362, at *5 (W.D. Mo. Nov. 30, 2015). Liberty Mutual argues that because the Court noted that State Farm's insurance policy's "actual cash value means replacement cost minus depreciation," the Court cannot interpret the ACV provisions in Liberty Mutual's policy without reference to replacement cost, which as the Court has found, incorporates application of a deductible. *Id.* at *5. This argument does not change the Court's interpretation of Liberty Mutual's policy. First, in addition to involving contract provisions

different from those in Liberty Mutual's policy, *Labrier* did not involve any dispute about whether deductibles were to be applied to ACV payments. *Id.* at 853, n. 5 ("There is no dispute that a deductible is also to be subtracted from the actual cash value payment."). Furthermore, calculating the ACV as replacement cost minus depreciation does not somehow transform an ACV payment into an RCV payment, as Liberty Mutual appears to argue; this is merely the formula that the insurance company uses to calculate what amount it will pay out for an ACV claim. The Court has already discussed the clear difference between an ACV and RCV payment under Liberty Mutual's policy, and Liberty Mutual's citation to *Labrier* does not impact this finding.

Additionally, Liberty Mutual repeats several other arguments that the Court already rejected in its previous Order, Doc. 115.[8] The Court reiterates its earlier analysis of these arguments, as needed. Contrary to Liberty Mutual's arguments regarding general principles of insurance law and the policy justifications behind its interpretation of the policy, the Court's interpretation does not threaten to upend the insurance industry or permit the insured to determine when he or she pays the deductible under normal circumstances. First, Liberty Mutual contends that the definition of "deductible" clarifies that Plaintiffs are required to pay a deductible on both RCV and ACV claims. As noted by the insurance company, the Western District of Missouri has recognized that a deductible is "the portion of the loss to be borne by the

---

[8] Liberty Mutual also contends that the Court's policy interpretation allows an insured to receive payments that "exceed the explicit limit of liability." [Doc. 195, p. 20-21; Doc. 215, p. 33-34]. This argument restates Liberty's standing argument, which is addressed previously in Section II.B., and fails for the same reasons. As discussed in Section II.B., the limitations related to replacement cost payments do not apply to ACV payments, and the "limit of liability" language relied on by Liberty Mutual again references the "replacement cost" provision. Because Plaintiffs in this class did not claim an RCV payment, the Court rejects Liberty Mutual's attempts to apply the RCV "limit of liability" provisions to their ACV claims.

insured before the insurer becomes liable for payment." *Western Heritage Ins. Co. v. Love.*, 24 F.Supp.3d 866, 879 (W.D. Mo. 2014). However, the definition of "deductible" does nothing to outline the circumstances under which a policyholder must pay the deductible. The circumstances under which a deductible must be paid are contained in the applicable insurance contract.

Moreover, nothing in the Court's opinion limits the circumstances under which a deductible may be applied or otherwise alters general insurance principles. The Court's task is to interpret the insurance policy at issue. As already discussed, this policy does not require Plaintiffs to pay a deductible if they elect to receive an ACV payment for claims arising under the base policy or Home Protector Plus Endorsement. That is not to say that Liberty Mutual could not have included a policy provision requiring Plaintiffs to pay such a deductible. However, the terms of the contract between Liberty Mutual and Plaintiffs did not impose any such requirement with respect to ACV claims, despite explicitly setting forth such a requirement with respect to RCV claims. How other insurance companies wrote their policies does not change the Court's analysis of Liberty Mutual's policy.

In addition, Liberty Mutual also reiterates its past argument that the policy's Declarations page requires Plaintiffs to pay a deductible on all claims, without regard to whether the claims are for ACV or RCV. [Docs. 195, p.19-20; 215, p. 20-21]. Liberty Mutual contends that, in denying its first motion for summary judgment, the Court wrongly "disregarded the Declarations." [Doc. 195, p.19-20]. Aside from disagreeing with the Court's original findings, Liberty Mutual does not offer any new theories related to this argument. Furthermore, contrary to Liberty Mutual's contention, the Court did consider the Declarations in its prior analysis and expressly rejected this argument. *See* [Doc. 115, p. 12-13].

27

Liberty Mutual again contends that the Declarations page, which includes reference to the general Section I deductible, is enough to require Plaintiffs to pay a deductible on all claims. "When the declarations page clearly communicates the coverage provided by the insurance contract, and the other policy provisions neither expressly change coverage nor reflect a different intention than that clearly expressed on the declarations page, the declarations page controls." *Christensen v. Farmers Ins. Co., Inc.*, 307 S.W.3d 654, 658 (Mo. Ct. App. 2010) (quotation omitted). The Declarations in the policy read as follows:

> SECTION I AND II: COVERAGES AND LIMITS UNDER YOUR LIBERTYGUARD HOMEOWNERS POLICY
>
> > I: COVERAGE A – YOUR DWELLING WITH EXPANDED REPLACEMENT COST  $158,300
> > COVERAGE B – OTHER STRUCTURES ON RESIDENCE PREMISES $15,830
> > COVERAGE C – PERSONAL PROPERTY WITH REPLACEMENT COST  $118,725
> > COVERAGE D – LOSS OF USE OF YOUR RESIDENCE PREMISES ACTUAL LOSS SUSTAINED
> > . . .
>
> DEDUCTIBLE: LOSSES COVERED UNDER SECTION I ARE SUBJECT TO A DEDUCTIBLE OF $1000
>
> > OTHER DEDUCTIBLES: $1000 WINDSTORM OR HAIL

[Doc. 214-1, p. 2-3 (Declarations), Bates LMFIC000062-63].

In relevant part, the Declarations provide, "Losses covered under Section I are subject to a deductible of $1,000." Contrary to Liberty Mutual's argument, this provision does not state that the class members' claims are subject to a deductible regardless of the compensation style selected. First, the Declarations' reference to a deductible does not "clearly communicate[] the coverage" of the deductible to a policy holder's claim because on its face, nothing in the Declarations references under what circumstances the Section I deductible will be applied. Instead, the conditions governing when this deductible is applied are set out in the remainder of

28

the policy.  Therefore, because the Declarations are not clear standing alone as to when a deductible applies, the Court must turn to the terms laid out in the remainder of the policy.  And, as described above, the terms of the base policy and Home Protector Plus Endorsement do not require the payment of a deductible on ACV claims.

Finally, as it did in its first motion for summary judgment, Liberty Mutual again contends that the filed rate doctrine precludes consideration of this case.  However, Liberty Mutual fails to argue that anything has changed to alter the Court's previous finding, which the Court maintains: "As the Court has merely interpreted the Policy at issue and has not made any conclusions regarding the propriety of the content of the Policy or the overarching rate scheme, the filed rate doctrine is inapplicable."[9]  [Doc. 115, p. 16].

For the previous reasons, class members who have claims under the Home Protector Plus Endorsement or base policy are entitled to summary judgment.

### D.  Wind/Hail Endorsement

The parties also move for summary judgment on the Wind/Hail Endorsement subclass, which includes the Lafollettes.  Plaintiffs contend that this endorsement does not alter when the deductible is applied but rather, affirms that a deductible is not applied to ACV claims.  The relevant language from the Wind/Hail Endorsement is as follows:

> **WINDSTORM OR HAIL DEDUCTIBLE**
> The following special deductible is added to the policy:
> With respect to the peril of Windstorm Or Hail, we will pay only that part of the total of all loss payable under Section I that exceeds the windstorm or hail deductible.
> The dollar or percentage amount of the windstorm or hail deductible is shown on the policy declaration.
> . . .

---

[9] For the Court's analysis of the filed rate doctrine's inapplicability to this case, see the Court's previous Order denying Liberty's first motion for summary judgment, [Doc. 115, p. 15-16].

> No other deductible in the policy applies to loss caused by windstorm or hail.

[Doc. 214-1, p. 34 (Lafollette Policy), Bates LMFIC000094].

In its Order denying Liberty Mutual's first motion for summary judgment on the wind hail endorsement, the Court found that the phrase "total of all loss payable under Section I" referred to "replacement cost described in Section I."  This finding was made in response to the parties' representation that only Section I, B.3.a. for Coverages A and B of the loss settlement provision was relevant.  Indeed, Liberty Mutual even argued that Section I, B.3.c., which dealt with personal property, could not be considered when interpreting Section I, B.3.a., which deals only with structures and other dwellings.  [Doc. 109, p. 4].  Based solely on Section I, B.3.a. for Coverages A and B, the Court found as follows:

> The Wind/Hail Endorsement says that an insured can get no more than the total loss payable under Section I minus a deductible.  Again, for purposes of this case, Section I refers to the Home Protector Plus Endorsement loss settlement provision, . . . [which] has two parts.   A homeowner may elect to take the ACV or make repairs and get the RCV.  While a loss payable under the Home Protector Plus loss settlement provision could refer to either an ACV or RCV payment, the Court must give meaning to the complete phrase, "*total of all* loss payable."  Therefore, it must consider what is the "total of all loss payable" under the Home Protector Plus Endorsement.   The total of all loss payable under the loss settlement provision of the Home Protector Plus Endorsement is the replacement cost after application of a deductible.   This is referred to as the replacement cost value.  Since the RCV is the most payable under the Home Protector Plus loss settlement provision, a reasonable person could interpret "total of all loss payable" in the Wind/Hail endorsement to be the RCV.
> In other words, the phrase, "With respect to the peril of Windstorm or Hail, we will pay only that part of the total of all loss payable under Section I that exceeds the windstorm or hail deductible," is read synonymously to "With respect to the peril of Windstorm or Hail, we will pay only that part of the *replacement cost value* payable under the *loss settlement provision* that exceeds the windstorm or hail deductible."   This interpretation is also consistent with the Court's interpretation of Section [B.3.] of the [Home Protector Plus Endorsement's] loss settlement provision as limiting the deductible to [Section B.3.a.] and excluding it from [Section B.3.d.] pursuant to the doctrine of *expressio unius est exclusion alterius*.

[Doc. 115, p. 9-10].

This interpretation is consistent with the binary choice presented by the parties when the issue was first briefed. With only replacement cost and ACV cost to consider, "total loss payable" could logically refer to replacement cost, the greatest amount payable. However, Liberty Mutual in its current motion for summary judgment has changed its argument. Liberty Mutual argues for the first time that the Court's interpretation of the Wind/Hail Endorsement is inconsistent with other applicable provisions within the base policy and by implication, the Home Protector Plus Endorsement. Specifically, Liberty Mutual points to Coverage C and D provisions of Section I – Property Coverages and Section I – Conditions. In light of these newly raised arguments and policy provisions, the Court reconsiders its original interpretation.

First, the Court concludes that the "Section I" referred to by the Wind/Hail Endorsement includes Section I – Property Coverages; Section I – Conditions; Section I – Perils Insured Against; and Section I – Exclusions, all contained in the base policy/Home Protector Plus Endorsement. Effectively, these are subparts of Section I, not separate sections.

Second, the Court "do[es] not interpret insurance policy provisions in isolation but rather evaluate[s] the policy in terms of a whole." *Mendota Ins. Co. v. Lawson*, 456 S.W.3d 898, 903 (Mo. Ct. App. 2015) (citing *Durbin v. Deitrick,* 323 S.W.3d 122, 125 (Mo. App. W.D. 2010)). Therefore, it must consider not just Coverages A and B of Section I but must also consider Coverages C and D to determine the meaning of "total of all loss payable under Section I."

Third, because the Wind/Hail Endorsement refers to Section I of the base policy, including multiple ways in which losses will be paid, not just losses under Coverage A and B for Dwellings and Other Structures, the phrase, "total of all loss payable" in the Wind/Hail Endorsement does not mean replacement cost, as argued by Plaintiffs and initially found by the

31

Court. Instead, an ordinary insured would understand that "total of all loss payable under Section I" refers to the sum total of any losses payable which includes losses for Coverage A, B, C, or D. Because it is no longer a binary choice, the reference to Section I in the Wind/Hail Endorsement cannot just be referring to ACV and replacement cost losses. Therefore, a deductible would be due for an ACV payment under Coverage A or B by the terms of the Wind/Hail Endorsement, even though the base policy and Home Protector Plus Endorsement do not require a deductible for ACV payments.

Thus, the Court finds that one windstorm/hail deductible applies, even if the insured takes only an ACV payment and does not elect to submit a replacement cost claim. Liberty Mutual's motion for summary judgment as to the Wind/Hail Endorsement subclass is therefore granted.

Because the Lafollettes, the only named plaintiffs, are included in the category of class members who can no longer assert their claims under the Wind/Hail Endorsement, the Lafollettes are no longer adequate representatives of the class. *See* Fed. R. Civ. P 23(a)(4). Specifically, it is clear that, because the Lafollettes' claim is not viable, they no longer "possess the same interest" in litigating such claims as any remaining class members who seek to assert claims under the Functional Replacement Cost Loss Endorsement or the Home Protector Plus Endorsement/Base Policy.

However, the fact that the Lafollettes' claim is no longer viable does not make this suit moot or necessarily undermine the claims of the remaining class members. Because a designated class has a status apart from that of the class representatives, dismissal of the class representatives' claims "does not inexorably require dismissal of the class action." *Smook v. Minnehaha County*, 457 F.3d 806, 815 (8th Cir. 2006). Therefore, rather than decertifying the class on the ground that the named plaintiffs are no longer adequate representatives, the better

course is to afford plaintiffs' counsel a reasonable period of time for the substitution or intervention of a new class representative. As such, the Court will afford Plaintiffs an opportunity to submit a motion for the substitution or intervention of new named plaintiffs in this action within 30 days of the date of this Order.

### E. The Functional Replacement Cost Lost Settlement Endorsement

Plaintiffs also move for summary judgment on the Functional Replacement Cost Lost Settlement Endorsement ("FRCE") subclass. They contend that like the other policy provisions already interpreted by the Court, this endorsement similarly prohibits Liberty Mutual from taking a deductible from an ACV payment made under the FRCE. Although Liberty Mutual argues against Plaintiffs' interpretation and contends that summary judgment must be denied for this endorsement subclass, Liberty Mutual does not, itself, move for summary judgment on the FRCE subclass.

When attached to the base policy and when applicable, the FRCE replaces the base policy's loss settlement provision with the following:

**FUNCTIONAL REPLACEMENT COST LOSS SETTLEMENT**
. . .
**SECTION I – CONDITIONS**
The following definition is added when this endorsement is attached to the policy:
**Functional Replacement Cost** means the amount which it would cost to repair or replace the damaged building with less costly common construction materials and methods which are functionally equivalent to obsolete, antique or custom construction materials used in the original construction of the building.
. . .
For the premium charges, item **3.b. Loss Settlement** is deleted and replaced by the following:
b. Buildings under Coverage A or B:
    (1) If, at the time of loss,
        (a) The amount of insurance in this policy on the damaged building is 80% or more of the functional replacement cost of the building immediately before the loss; and
        (b) You contract for repair or replacement of the damaged building for the same use, within 180 days of the damage

33

unless we and you otherwise agree;

we will pay, *after application of deductible*, the lesser of the following amounts:

    (a) The limit of liability under this policy that applies to the building; or

    (b) The necessary amount actually spent to repair or replace the damaged building on a functional replacement cost basis.

(2) If you do not make claim under Paragraph (1) above, we will pay, *after application of deductible*, the least of the following amounts:

    (a) The limit of liability under this policy that applies to the building;

    (b) The actual cash value of the damaged part of the building; or

    (c) The amount which it would cost to repair or replace the damaged building on a functional replacement cost basis.

(3) If, at the time of loss, the amount of insurance in this policy on the damaged building is less than 80% of the functional replacement cost of the building immediately before the loss, we will pay that proportion of the cost to repair or replace that part of the building damaged:

    (a) After application of deductible; and

    (b) With deduction for depreciation:

which the total amount of insurance in this policy on the damaged building bears to 80% of the functional replacement cost of the building, but not more than the limit of liability under this policy that applies to the building.

. . .

(5) If the actual cash value of the damage is less than the functional replacement cost:

    (a) We will pay no more than the actual cash value of the damage until replacement is complete. Once replacement is complete, we will settle the loss according to the provisions b.(1) and b.(3) above.

    However, if the cost to functionally repair the damage is both:

        (i) Less than 5% of the amount of insurance in this policy on the building; and

        (ii) Less than $2,500;

        we will settle the loss according to the provisions of b.(1) and b.(3) above whether or not replacement is complete.

    (b) You may disregard the functional replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis.

You may then make claim for any additional liability according to the provisions of this Condition 3. Loss Settlement, provided we are notified of your intent to do so within 180 days of the date of loss.

[Doc. 199-4, p. 2-3 (FRCE Endorsement), Bates LMFIC031162) (emphasis added)].

Section b.(1) specifically states that Liberty Mutual will pay "after application of deductible," the lesser of the limit of liability under the policy or the necessary amount actually spent to repair or replace the building on a functional replacement cost basis. Section b.(2) then states that if the insured does "not make a claim under Paragraph (1) above," Liberty Mutual will pay, "after application of the deductible," the least of three amounts, including "the actual cash value of the damaged part of the building" or "the amount which it would cost to repair or replace the damaged building on a functional replacement cost basis." Section b.(3) addresses how replacement cost will be paid when the insurance is less than 80% of the building's value, which it specifies to be paid "after application of deductible." Section b.(3)(a).

Unlike the other endorsements this Court has analyzed, the FRCE clearly applies a deductible regardless of whether an FRCE claim is made for RCV or ACV. Again, an insurance policy is ambiguous only where there are competing reasonable policy interpretations. *Western Heritage Ins. Co. v. Asphalt Wizards*, 795 F.3d 832, 838 (8th Cir. 2015). It would be unreasonable to interpret the FRCE provisions applying to ACV payments as prohibiting application of a deductible when they specifically state, "after application of deductible."

Plaintiffs contend that Section b.(5)(b) controls the interpretation of the FRCE endorsement, is ambiguous, and would reasonably be read to mean that a deductible does not apply to an ACV payment. In relevant part, this provision states:

> **FUNCTIONAL REPLACEMENT COST LOSS SETTLEMENT**
> . . .
> **SECTION I – CONDITIONS**
> . . .
> b. Buildings under Coverage A or B:
>     . . .
>       (5) If the actual cash value of the damage is less than the functional replacement cost:
>           (a) We will pay no more than the actual cash value of the damage until replacement is complete. Once replacement is complete,

> we will settle the loss according to the provisions b.(1) and
> b.(3) above.
> However, if the cost to functionally repair the damage is both:
>> (i)  Less than 5% of the amount of insurance in this policy
>>      on the building; and
>> (ii) Less than $2,500;
>> we will settle the loss according to the provisions of b.(1)
>> and b.(3) above whether or not replacement is complete.
> (b) You may disregard the functional replacement cost loss
>     settlement provisions and make claim under this policy for
>     loss or damage to buildings on an actual cash value basis.
> You may then make claim for any additional liability according to
> the provisions of this Condition 3. Loss Settlement, provided we
> are notified of your intent to do so within 180 days of the date of
> loss.

Pointing to b.(5)(b), Plaintiffs contend that by allowing the insured to "disregard the functional replacement cost loss settlement provisions" and receive an ACV payment, b.(b)(5) is the *only* relevant provision in the FRCE, and no other provisions are implicated. Plaintiffs argue that because this provision fails to include any mention of a deductible, a reasonable insured would read it to mean that making an ACV claim under this endorsement would not include application of a deductible. However, the general rule of contract interpretation, *expressio unius est exclusio alterius,* does not apply here. The RCV and ACV provisions all provide for "after application of deductible." A reasonable interpretation of this policy does not permit reading Section b.(5)(b) in isolation, but rather, requires reading it in conjunction with the previous paragraphs. When read together, Section b.(5)(b) does not reference a deductible for ACV *or* RCV because the preceding paragraphs clearly state that a deductible is applied, regardless of the loss settlement method. Therefore, the policy permits Liberty Mutual to apply a deductible to an ACV claim made under this endorsement. For these reasons, Plaintiffs' motion for summary judgment on the FRCE subclass is denied.

The Court's finding that the FRCE does apply a deductible to ACV claims made under this endorsement does not impact its previous findings that a deductible may not be applied to ACV claims brought under the base policy or Home Protector Plus Endorsement. As evidenced by the previous analysis, the FRCE provision's language is self-contained and was interpreted based solely on its own terms. Therefore, the Court's finding with respect to the FRCE subclass does not conflict with its previous interpretations.

### F. Damages

As damages for breach of contract, Plaintiffs seek payment of the amount of each class member's deductible withheld by Liberty Mutual. However, Liberty Mutual argues that genuine issues of material fact about damages preclude granting summary judgment in Plaintiffs' favor. First, Liberty Mutual argues that genuine issues of material fact exist as to whether the initial payments Liberty Mutual made to certain class members were high and constitute the limit of liability under the policy's plain terms. Alternatively, Liberty Mutual argues that certain class members' ACV payments constitute the "true" ACV of the loss plus the return of the deductible. In other words, Liberty Mutual contends that certain class members received all that they were owed under the policy.

Although Liberty Mutual characterizes these arguments as "issues of material fact" precluding summary judgment, they are not. Instead, these are legal arguments that Liberty Mutual has already made regarding the Lafollettes' alleged lack of standing. The Court has already rejected these very arguments above in Part II.B., and the Court's reasoning applies with the same weight to those "certain class members" who may have been "overpaid" their ACV. As the Court already reasoned, there cannot be an "overpayment" of the ACV when the evidence shows that the ACV payment belongs to the insured and is unrelated to the amount actually spent

to complete repairs.  Likewise, because the class members received only an ACV payment, the RCV provisions and limits of liability do not impact their ability to recover damages.

Because the Court has found that Liberty Mutual breached its policy by applying deductibles to ACV claims made under the base policy and Home Protector Plus Endorsement, each of these affected class members has been damaged by the amount of the withheld deductible.  Liberty Mutual has produced documentation specifying the amount of the deductible withheld from each class member, and Liberty Mutual's manager of business systems has testified that Liberty Mutual is capable of determining the amount of deductible applied to a claim.  *See* [Doc. 199-6 and 199-7 (Spreadsheets); Doc. 199-8, p. 137 and 180-81 (Depo. of Jeffrey Gabriel)].  Therefore, calculation of damages simply requires application of Liberty Mutual's own records, which identify the amount of deductible withheld from each class member.

### III.    Conclusion

For the reasons set forth above, Plaintiffs' and Defendant's motions for summary judgment are granted in part and denied in part.  Summary judgment is granted in favor of Defendant as to the Wind/Hail Endorsement subclass.  Summary judgment is granted in favor of Plaintiffs for their claims under the base policy/Home Protector Plus Endorsement and for damages.  Plaintiffs' motion for summary judgment is denied as to the Functional Replacement Cost Loss Settlement class.

Rather than decertifying the class on the ground that the named plaintiffs are no longer adequate representatives of the class, the Court affords Plaintiffs an opportunity to submit a

motion for the substitution or intervention of new named plaintiffs in this action within 30 days of the date of this Order.

/s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: March 16, 2017
Jefferson City, Missouri